**GLENDALE FEDERAL BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–772C.**

United States Court of Federal Claims.

April 9, 1999.

Ronald W. Stevens, Kirkpatrick & Lockhart, Washington, D.C., with whom were Joseph J. Brigati, Kirkpatrick & Lockhart, Washington, D.C., Richard D. Bernstein, Sidley & Austin, Washington, D.C., and Jerry Stouck, Spriggs & Hollingsworth, Washington, D.C., for plaintiff.

Jeanne E. Davidson, with whom were Rodger D. Citron, Colleen A. Conry, Henry R. Felix, F. Jefferson Hughes, Tarek Sawi, Rhonda Schnare, Nuriye C. Uygur, Arthur G. Wyatt, Kenneth Nagle, Ming–Yuen Meyer–Fong, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and David W. Ogden, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This case is before the court after an extended trial on damages. In *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), the Supreme Court held that plaintiff had an enforceable contract with the government to treat supervisory goodwill created as a result of Glendale's acquisition of First Federal of Broward (Broward), as regulatory capital, and to amortize the goodwill over a forty-year period. This contract was breached by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183, which eliminated the ability of Glendale to count goodwill as regulatory capital. Plaintiff seeks damages resulting from this breach.

At trial, the court permitted plaintiff to put on evidence of damages based on the three traditional theories of contract recovery: expectation, reliance and restitution. In addition, defendant has filed a motion for summary judgment raising a special plea in fraud based on 28 U.S.C. § 2514 (1994). The trial ultimately took more than 150 days and more than 20,000 pages of trial transcript, and was conducted over a period of fourteen months. A great proportion of the trial was spent putting on evidence establishing, and challenging, plaintiff's claim for expectancy damages.

After a thorough examination of the record, including the excellent CD–ROM post-trial briefs prepared by the parties in response to 92 questions posed by the court, and a review of the relevant law, the court denies defendant's motion for summary judgment based on the special plea in fraud, and awards plaintiff damages in the amount of

$909 million, which reflects the restitution and non-overlapping reliance damages which plaintiff proved at trial. The court denies plaintiff's claim for expectancy damages, for the reasons set forth in the discussion below.

The court should note that the trial went on for so long for several reasons. First, the court made a conscious decision that this trial, the first of more than 120 *Winstar*-related cases pending before the court, would serve to air and test many of the models and theories at issue in most of the other cases. This, it is hoped, will, and appears already to have, provided a useful experience for the *Winstar*-related cases following this one to trial on damages. Second, the issues are complex, involving a huge body of documentary evidence and claims of over $2 billion. The mandate of due process required this court to allow the parties a full opportunity to litigate. This the court did using its general rule allowing the parties all the time they need with no formal limits. Third, the plaintiff requested an early trial date following the Supreme Court's 1996 affirmance of this court's liability decision. This was sought because the breach was having a significant and continuing detrimental effect on the plaintiff. However, the speed of moving to trial in only eight months, in a case involving millions of documents in discovery and a multitude of experts with complex and sophisticated reports, greatly reduced the efficiency and refinement of the issues normally gained by the court's extensive pretrial process. The lessons learned in this trial, one of the court's longest, if not the longest, in its history, can be of great value, both the positive and the negative lessons.

This opinion is organized as follows: Part I is an overview of the underlying transaction, the breach, and the resulting effect of the breach on the bank. Part II is a summary of the alternative damage theories. Part III examines plaintiff's claim for expectancy damages, and, because defendant's summary judgment motion is premised on matters critical to plaintiff's claim for expectancy damages, that motion is reviewed in that discussion. Part IV examines the reliance claims. Part V examines the restitution claim, while Part VI is the conclusion.

## I. FACTUAL OVERVIEW

The facts that are presented here are findings of the court, but they are not intended to be comprehensive. Rather, they are designed to put the contract, breach, and resulting actions in context. Additional factual findings, as necessary, will be discussed as the court deals with each of plaintiff's damage theories.

The facts surrounding the formation and breach of this contract, and the crisis generally affecting the savings and loan industry, have been covered extensively in prior opinions of this court, the United States Court of Appeals for the Federal Circuit, and the United States Supreme Court. *See United States v. Winstar Corp.* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Winstar Corp. v. United States* 64 F.3d 1531 (Fed.Cir. 1995); *Statesman Savings Holding Corp. v. United States* 26 Cl.Ct. 904 (1992); *Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992); and *Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990). Glendale Federal was a savings and loan institution primarily doing business in California. In 1981, Glendale engaged in a supervisory merger with First Federal Savings and Loan Association of Broward County (Broward) in Florida. At the time of the merger, the market value of the liabilities of Broward exceeded the market value of the assets by $734 million. Pursuant to its contract with the government, Glendale was permitted to treat the resulting market value deficit as supervisory goodwill, an asset for purposes of meeting regulatory capital requirements. At the time of the merger, Glendale was, as the Supreme Court found, "profitable and well capitalized, with a net worth of $277 million." 518 U.S. at 861, 116 S.Ct. 2432. Indeed, had Glendale not been able to treat supervisory goodwill as regulatory capital, it would have become immediately insolvent, with a capital deficit of nearly $500 million. This would have, of course, incapacitated Glendale and made it impossible to operate, since it would have been in violation of the regulations with negative net worth.

In essence, Glendale was permitted to book Broward's net excess liabilities (nega-

tive net worth) as an asset for regulatory capital purposes, to be amortized on a straight-line basis over 40 years. While the purpose of this contract is now in some respects disputed by defendant, in general terms it is clear that the supervisory goodwill and the long amortization was designed to fill the capital hole, permit Glendale to maintain its ability to leverage its existing capital, give the thrift the ability to generate income to replace the amortizing goodwill and, ultimately, make the whole enterprise profitable.

In 1989, eight years into the contract, FIRREA and its subsequent regulatory directives repudiated the government's contractual goodwill obligations to Glendale. The contract had required the government to recognize Glendale's goodwill as an asset for purposes of regulatory capital over the contract's forty-year amortization period, or until 2021. FIRREA and its implementing regulations repudiated that obligation by requiring Glendale to deduct goodwill in determining its regulatory capital on a greatly accelerated schedule. As of December 31, 1989, Glendale could not count goodwill as a part of tangible capital at all. Moreover, the amount of supervisory goodwill which Glendale could count as core capital was phased out on a sliding scale and eliminated entirely by January 1, 1995. In addition to mandating the phase-out of goodwill as an asset includable in calculating a thrift's regulatory capital ratios, FIRREA and its implementing regulations also changed the minimum requirements for capital. Specifically, FIRREA imposed three new capital requirements: (1) it required that tangible capital constitute at least 1.5 percent of assets, 12 U.S.C. 1464(t)(2)(B); (2) it required that core capital constitute at least 3 percent of its assets, 12 U.S.C. 1464(t)(2)(A); and (3) it established risk-based capital requirements, in which risk-based capital is measured against the risk-weighted balance of total assets, 12 U.S.C. 1464(t)(2)(C); 12 C.F.R. § 567. The minimum core capital required for an institution to be considered adequately capitalized was subsequently increased to four percent, effective December 1, 1992, by the Federal Deposit Insurance Corporation Improvement Act of 1991 (FDICIA), Pub.L.

No. 101–242, 105 Stat. 2236, and its implementing regulations.

After FIRREA, Glendale ultimately failed the risked-based capital requirement, in March 1992, and the core capital requirement, in December 1992. On January 26, 1993, the Office of Thrift Supervision (OTS) issued under FDICIA a Prompt Corrective Action Directive (PCA) to Glendale requiring it to achieve a core-capital ratio of five percent and a risk-based capital ratio of ten percent. The PCA was ultimately withdrawn after Glendale engineered a massive recapitalization to get it above the FIRREA and FDICIA risk-based and core capital requirements.

These facts are essentially undisputed. It is the task of this opinion to determine what damages, if any, accrued as a result of the government's breach. Glendale contends that it has suffered massive damages resulting from the government's breach, and seeks damages ranging from more than $800 million under its reliance theory to more than $2 billion under its restitution theory. Briefly, plaintiff argues that it conferred huge benefits on the government and suffered huge losses as a result of the government's breach. Defendant, on the other hand, contends under any theory put forward plaintiff is not entitled to any damages, and, to the extent it is entitled to any damages it would only be for the transaction costs incurred in recapitalizing the thrift in 1993. In sum, defendant contends that plaintiff had received all, or almost all, of the benefits of the bargain at the time of the breach and that FIRREA actually was beneficial to Glendale because it forced Glendale to exit what in hindsight turned out to be money-losing lines of business, thus entitling it to little or no damages.

The parties agree on very little in this case. They differ on their interpretations of the law of damages. They differ on their views about the credibility and validity of plaintiff's damage models, particularly plaintiff's model justifying its claim for lost profits. But perhaps most fundamentally, they differ on whether there are any damages at all.

## II. THE DAMAGE THEORIES

As stated previously, the court permitted plaintiff to put on evidence in support of an award of damages under the three traditional contract damage measures of relief: expectancy, reliance and restitution. The court will summarize plaintiff's arguments, and defendant's counter to those arguments, under each of the three traditional measures of relief.

### 1. *Expectancy Damages*

Plaintiff contends that it is has proved expectancy damages in the amount of $1.603 billion. The amount consists of the following: (1)lost profits from the date of breach to the date of trial; (2) lost future profits from the date of trial until 2021; (3) increased cost of funds; and (4) increased deposit insurance premiums, OTS assessments, and other miscellaneous costs imposed by the breach. Plaintiff contends that it has put forward evidence sufficient to meet the standards for awarding expectancy damages: (a) these damages were both actually and reasonably foreseeable at the time of contract formation; (b) the breach caused the damages; and (c) the damages have been proved with reasonable certainty.

With regard to the lost profits, both past and future, plaintiff contends that the evidence put forward at trial shows that the consequences were both actually and reasonably foreseeable, because regulators knew that Glendale would leverage its regulatory capital in order to grow, in order to pay for the amortizing goodwill and compensate for the excess liabilities it assumed from Broward. Hence, it was both actually foreseen, and reasonably foreseeable, that, should the government breach, Glendale would either have to shrink or raise capital to fill the capital deficit. Moreover, Glendale contends the evidence shows it could not raise capital before it did, leaving balance sheet shrinkage as the only option.[1] Glendale also contends that this breach was the substantial factor

which caused it to shrink in order to get back into capital compliance. Glendale argues that, as a result, it was also forced to sell its profitable Florida franchise and University Savings, its Washington state franchise. Lastly, Glendale contends that it would have earned at least 1.1% return on its foregone assets but for the breach. As to its future lost profits, Glendale also put forward a "hypothetical preferred stock" alternative model, considered less preferable by plaintiff's principal expert, which is the minimum present value of the cost of replacing the contractual goodwill Glendale should have had at the time of trial.

Plaintiff also contends that it had to pay more for deposits to fund its lending activities as a result of the breach, and that this was both actually foreseen and reasonably foreseeable by the regulators. These regulators would know that an ultimate failure to remain capitally compliant would force the bank to raise its deposit rates in order to attract and keep deposits. Likewise, plaintiff argues that it was both actually foreseen and reasonably foreseeable at the time of contract formation that failure to honor the goodwill provision would impair the capital position of the bank and lead to higher deposit insurance premiums and additional regulatory assessments. Lastly, plaintiff contends it is entitled to the transaction costs resulting from its 1993 capitalization, the 1994 sale of Glendale's Florida franchises and the 1995 sale of University Savings, which Glendale contends it otherwise would not have sold, and custodial fees paid to the San Francisco Federal Home Loan Bank.

Defendant makes a many-pronged attack on plaintiff's theory and evidence. Most significantly, defendant has filed a motion for summary judgment based on a special plea in fraud pursuant to 28 U.S.C. § 2514. Defendant argues that plaintiff's entire damage claim should be forfeited because sworn statements provided by officers of Glendale to this court and the Federal Circuit in prior proceedings, concerning how the breach

---

1. Required capital ratios are reflected generally in the ratio of capital to total assets. The elimination of supervisory goodwill as an asset for the calculation of its capital lowered Glendale's capital, leaving only two options in an effort to stay in compliance: either raise more capital to support the balance sheet or shrink the balance sheet in an effort to make the non-regulatory capital amount sufficient to support the balance sheet under current regulations.

hampered Glendale's ability to leverage, squarely contradict those made during trial, which provide the foundation for plaintiff's expert lost profits model.

Defendant offers several legal and methodological challenges to plaintiff's lost-profits theory. Defendant argues that plaintiff's theory of lost profits is methodologically flawed and contrary to settled principles of economics and finance. Defendant further argues that plaintiff's theory is based on a fundamental misunderstanding, or misreading, of what the goodwill contract was all about. Lastly, defendant contends that this theory would require the court to engage in a far more speculative inquiry than that already rejected in *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed.Cir.1996).

As to plaintiff's consequential damages resulting from the breach, defendant argues that these were not caused by the breach, but by plaintiff's own actions, and that, causation notwithstanding, they are methodologically unsound regardless.

### 2. Reliance Damages

Plaintiff seeks alternatively to recover its reliance interest, which the Restatement of Contracts defines as the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made." *Restatement (Second) of Contracts* § 344(b). Glendale claims it has proved reliance damages totaling $862,770,-000. Glendale seeks its pre-breach costs of performing under and relying on the contract, including what Glendale considers the cost of acquiring Broward (the assumption of Broward's net liabilities), Glendale's cost of acquiring related Florida operations, and Glendale's payment under the contract's interest rate provision. In addition, Glendale seeks certain post-breach damages caused by investments made in reasonable reliance that the government would perform, including Glendale's post-breach costs of operating its

Florida franchise until it was sold in 1994, as well as Glendale's wounded bank damages[2], which plaintiff contends it would not have had to incur because it would have remained in capital compliance had it never entered into the contract. Plaintiff credits defendant for the benefits it accrued as a result of the contract, including the sale of the Florida franchise, and those benefits from interest rate reductions, loan sale gains, and accretion into income.

Defendant makes three major criticisms of plaintiff's reliance argument, as well as several methodological challenges. First, defendant contends that as a matter of law plaintiffs cannot recover reliance damages because Glendale would have ultimately lost money had the government fully performed. Second, defendant challenges plaintiff's basic contention that Glendale paid anything for Broward; it rejects plaintiff's premise that the assumption of Broward's excess liabilities represents all, or part of, a purchase price paid by Glendale. Third, defendant contends that plaintiff is precluded from seeking reliance damages based on the costs incurred after the breach, including the wounded bank damages and any post-breach operating losses in Florida, because these were not made in reasonable reliance on the contract.

### 3. Restitution Damages

Plaintiff has proffered evidence for restitution damages as an alternative remedy. According to the Restatement, restitution is the plaintiff's "interest in having restored to him any benefit that he has conferred on the other party." *Restatement (Second) of Contracts* § 344(c). Plaintiff's restitutionary claim, including *non-overlapping* reliance damages, totals $2.015 billion. As part of the restitution interest, plaintiff claims the following as immediate benefits that defendant received at the moment of the merger: relief from the obligation to pay Broward's excess liabilities; the ability to invest earnings of the government insurance funds which were

---

**2.** "Wounded bank damages" refer to those costs Glendale incurred because of its falling out of capital compliance as a result of the breach. These damages are comprised principally of the increased costs Glendale had to pay for deposits

to fund the bank, as well as increased insurance premiums and regulatory assessments. According to Glendale, these are costs it would never have had to pay had there been no breach.

enabled by Glendale's assumption of Broward's liabilities; Glendale's payment pursuant to the interest rate provision of the contract; and non-overlapping reliance damages (principally its wounded bank damages).

Defendant responds that plaintiff is entitled to no restitution award, for several reasons. First, defendant challenges the notion that plaintiff conferred any benefit on the government, since at all times before and after the merger the FSLIC backed the deposits of Broward, so it was no better off after the merger. Second, defendant contends plaintiff could not provide a benefit, since, at the time of the merger, it was likely insolvent on a market basis. It therefore had no assets to pay off these liabilities. Third, defendant contends that the economics of the transaction show that there is no scenario in which plaintiff could provide a benefit to the government. The merger served to buy time for interest rates to fall, but nothing else. Lastly, defendant argues, even were the court to consider the assumption of the liabilities as conferring a benefit, it would be far less than the market value of the liabilities, since the government had several less costly alternatives it could have pursued.

The government contends that Glendale saved the government nothing. Because it received no monetary benefit, plaintiff is not entitled to recoup money earned by the insurance fund. Even were the court to entertain the notion that plaintiff provided a restitutionary benefit, any award of profits made by the fund is barred by the law of restitution and is really a claim for prejudgment interest to which it is not entitled. According to the government, the non-overlapping reliance damages are both legally unrecoverable and improperly calculated

### 4. Defendant's Damage Theory

Defendant contends that plaintiff suffered no damages, and indeed benefitted from the breach, because FIRREA and the new capital requirements forced Glendale to get out of high risk areas of lending that ultimately proved unprofitable, and in which defendant contends plaintiff would have continued to be actively involved. To the extent plaintiff is entitled to any damages, it would only be entitled to $27.98 million, the flotation costs for the recapitalization in 1993.

## III. EXPECTANCY DAMAGES

A party's expectancy interest is the "interest in having the benefit of his bargain by being put in as good a position as he would have been had the contract been performed." *Restatement (Second) of Contracts* § 344(a). The largest component of plaintiff's expectancy claim, and the issue that by far occupied the vast majority of trial time, is damages from lost past and future profits. The preliminary issue is whether, and to what extent, a party is entitled to pursue lost profits, and the second inquiry, assuming that lost profits are not otherwise prohibited by law, is whether plaintiff has proved the elements.

The government contends that the law of this Circuit bars the award of lost profits damages based on contracts with third parties. The government argues that a hundred-year line of cases, from *Myerle v. United States*, 33 Ct.Cl. 1 (1897), to the recent decision in *Wells Fargo Bank v. United States*, 88 F.3d 1012 (Fed.Cir.1996), prohibit damages based on "independent and collateral undertakings ... entered into in consequence and on the faith of the principal contract." *Myerle*, 33 Ct.Cl. at 26.

Defendant's intellectual problem is that, far from reaffirming any rule prohibiting any lost profits damages based on "collateral undertakings," *Wells Fargo* recites prior law supporting the award of precisely those type of lost profits. *Wells Fargo* involved the failure of the Farmers Home Administration to honor a commitment to guaranty a loan extended pursuant to the federal ethanol loan guaranty program. The Court of Federal Claims awarded lost profits damages on the theory that the failure to guarantee the loan reduced the capital of Wells Fargo, which consequently reduced the ability of Wells Fargo to lever that lost capital, resulting in lost income because it could not make otherwise profitable loans. The Federal Circuit rejected the holding of this court that plaintiff was entitled to lost profits based on this theory:

Wells Fargo's loss of interest on additional loans it allegedly could have made had there been no breach is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of contract in this suit." *Id.* (citing *Ramsey v. United States,* 121 Ct.Cl. 426, 101 F.Supp. 353, 357–58 (1951)).

*Wells Fargo,* 88 F.3d at 1023. Critical to this issue is the purpose of the contract. In contrasting this case to another case, *Neely v. United States,* 152 Ct.Cl. 137, 285 F.2d 438 (1961), the Federal Circuit in *Wells Fargo* stated:

> Unlike the present case, the profits lost in Neely were profits on the use of the subject of the contract itself. Indeed, the only purpose of the contract in Neely and the other cases was for plaintiff to make profits on the subject of the contract—through mining, dairy cow operations, or property resale.
>
> In the present case, the purpose of the guarantee was to enable Wells Fargo to make profits from the interest on its loan to High Plains, not on some other loans it might make.

*Wells Fargo,* 88 F.3d at 1023. Critical to the inquiry, then, is what the purpose of the contract is. Although, as it happens, Wells Fargo and Glendale happened to use the same expert, who happened to put forward a lost profits theory based on lost leverage, the contracts, and their purposes, are very different. The question is not whether the profits are to be derived from undertakings with third parties, but what the subject and purpose of the contract is. *Neely* and *Chain Belt v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701 (1953), involved profits made from deals with third parties. The fundamental and initial question then is whether the subject of the contract, its very purpose, was to enable Glendale in this instance to generate profits through leverage. If the answer is yes, then Glendale should be entitled to show the other elements; if not, if these lost profits do not emanate from the subject matter of the contract itself, then they would properly be construed as "incidental and collateral undertakings" unrelated to the contract and hence unrecoverable. *See Ramsey,* 101 F.Supp. at 357–58.

■ *Wells Fargo* does not appear to alter the traditional rule that expectancy damages, including lost profits, are recoverable, so long as they are either actually foreseen or reasonably foreseeable, are caused by the breach of the promisor and are proved with reasonable certainty. The issue of foreseeability is interrelated to the issue of purpose, as described by the Federal Circuit, and assists in resolving the question of foreseeability. To be sure, plaintiff and defendant differ strongly on what the purpose of the contract was, and hence whether any resultant lost profits are foreseeable. But it appears clear to the court that neither *Wells Fargo* nor any other precedent operates *per se* to bar lost profits.

The court must then inquire as to what the purpose of the goodwill promise was, and whether that damage caused by the breach was either actually foreseen or reasonably foreseeable by the government at the time of contract formation. Defendant contends that the purpose of the contract was quite limited: it was, according to the government, designed to "buy time" until interest rates fell. Hence, there is no reason to think that, as part of this contract defendant contemplated or foresaw that the goodwill would be used as a leveraging device. The evidence adduced at trial, however, strongly supports plaintiff's argument that the central purpose of the goodwill promise was to ensure that Glendale could continue to use leverage notwithstanding the merger, over a sufficient amount of time that would allow it to absorb the costs of the merger while maintaining capital compliance. This is supported by the testimony of two government regulators who were involved in the merger, Dr. James Croft and Mr. Thurman Connell, as well as the testimony of Glendale's former president, Mr. Norman Coulson. The testimony of Mr. Brett Beesley, former Director of the FSLIC at the time of the merger, relied on by defendant in support of its narrow construction of the contract, does not contradict this reasoning. Mr. Beesley testified that the contract was designed to "buy time" until interest rates fell. "Buying time" was cer-

tainly part of the equation, but another part of the equation was to give Glendale the wherewithal to continue doing business, which in the case of a thrift means making loans, notwithstanding an otherwise severe capital deficit. Supervisory goodwill enabled the thrift to do so. In fact, if the government's interpretation was correct Glendale would have been very foolish, if not crazy, to enter the contract.

The evidence shows that a central purpose of the contract was to enable Glendale to survive and continue profitable business after the merger. The testimony of Dr. Croft and Mr. Connell supports a finding that this was actually foreseen at the time the contract was formed. Further, in light of the basic nature of the contract it was necessarily foreseeable, by any reasonable regulator or banking official, that the goodwill promise was designed to protect Glendale's ability to use leverage after the merger. There was no evidence to the contrary.

The court will address the next two issues, causation and reasonable certainty, in tandem. Plaintiff argues that the breach was the substantial factor in causing it to fall out of capital compliance and ultimately shrink, and that the sales of the Florida franchise and University were the result of the shrink. Plaintiffs then develop a model projecting what they believe is a conservative estimate of what an appropriate average return would be on the lost business size by showing that it would have earned a 1.1% rate of return on its purchased asset portfolio, which is representative of the average return Glendale like-'ly would have earned on all its foregone assets.

The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits damages based on the government's breach of the contract 32 years before it was supposed to end. Ultimately, the court finds that there are enough infirmities in the damage model to undercut its credibility in determining Glendale's lost profits as a result of the breach from 1989 to 2021. While the court believes there were indeed significant lost profits, plaintiff's model does not adequately prove the amount. The type of damage inflicted by the breach, the high quality of Glendale's management team, the institution's survival of the breach, and the post-breach world, while many other savings and loans failed, and the current profitability of the institution at the time of trial, all support a strong inference of substantial profits in a non-breach scenario. However, the problem is quantification.

■ The court will discuss several of these infirmities, but an important one, the apparent inconsistencies of the affidavits of Mr. Stephen Trafton and Ms. Kathryn Snyder which were before the court in prior proceedings, and the statements made during the damages trial, illustrate exactly what the problem is in composing a lost profits damage model. The government points to a series of statements made in affidavits by two Glendale officers, Mr. Trafton and Ms. Snyder, contained in prior submissions to this court and the Federal Circuit. These statements were filed as part of plaintiff's Motion for Summary Judgment in 1991, as part of its Motion for Interlocutory Appeal before the Federal Circuit, and as part of its Statement of Remedy Claims before this court in 1993. These statements indicate that the breach of the goodwill provision forced Glendale to restructure and exit out of higher risk-weighted lines of business. The statements are not consistent with statements made by Mr. Trafton and Ms. Snyder during trial—and relied upon by Glendale's principal expert, Dr. Nevins Baxter, in his damage model—that Glendale was planning to exit these same lines of business for reasons unrelated to the breach.

The government's motion for summary judgment based on the special plea in fraud is based on these inconsistencies. 28 U.S.C. § 2514 provides:

A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

The government argues that the prior sworn statements cannot be squared, and that ei-

ther in the prior proceedings or in this trial, plaintiff's officers were prevaricating. Defendant therefore argues that it has met its burden of proof in showing that plaintiff intended to deceive the United States about the validity of its damage claims.

At trial, Glendale confronted the discrepancies, and its witnesses offered several arguments for why the prior affidavits were inadvertently inaccurate. Among these were the contention that Glendale's counsel and officers did not appreciate the distinction between events caused by the breach-related provisions of FIRREA and those caused by non-breach related provisions, and that they were confused generally about causation. Mr. Trafton also testified that he was insufficiently attentive at the time the original affidavits were offered, because he was focused on restructuring the bank, keeping it in capital compliance, raising capital, and placating regulators.

The statements contained in prior court submissions do not rise to the level of a showing of fraud, but they do seriously challenge the credibility of plaintiff's trial testimony about the balance sheet structure of Glendale's foregone assets upon which Dr. Baxter relied in developing his model. The

court clearly understands, given the wide scope of this contract and the breadth of the changes in the law created by FIRREA, that there was confusion about the effects of the breach on the total operations of Glendale. But one point is particularly clear from the early affidavits: regardless of confusion over causation or breach versus non-breach provisions of FIRREA, the contemporaneous affidavits suggest that Glendale believed at the time that it should continue to invest in higher risk-weighted lines of business. What Glendale believed was profitable is irrelevant to any causation problems. This does not mean fraud has occurred, but rather, more likely, that Glendale cannot help but think about what it would have done with the benefit of hindsight. It also means that *post hoc* reconstructions of this sort are likely to be colored by knowledge of what actually happened, and similarly not credible, absent the existence of less ambiguous or conflicting contemporaneous evidence.

■ The court notes that plaintiff's lost profits model contains several serious infirmities, which, for reasons similar to those mentioned above, make it unreliable and the lost profits too remote and speculative to be granted.[3] However, the court realizes that

3. There are several serious infirmities which also render plaintiff's lost profits claim too speculative. First, plaintiff's model is premised on a portfolio of purchased fixed-rate assets funded by retail and wholesale liabilities. Dr. William Hamm, however, testified credibly that the success of such a strategy is premised upon interest rates falling in order to generate a significant return, because short-term liabilities would reprice more quickly than the longer-term assets they fund. However, the evidence also shows that this was inconsistent with Glendale's expectations that interest rates would rise. (For example, Glendale reduced its repricing gap from –5.5 percent at the end of 1991 to 13.4 percent in 1992, which suggests that, during that period, Glendale was restructuring its balance sheet to take advantage of anticipated rising interest rates, even though the model is, as Dr. Hamm testified, premised on rates falling during the same time period.)

Second, while there was much testimony about whether Glendale's model exposed it to interest rate risk levels beyond those that its board, or regulators, would have permitted, and the evidence on that point was inconclusive, it is indisputable that the foregone portfolio would have entailed far greater interest rate risk than the bank otherwise was taking. Although Mr. Traf-

ton, during the rebuttal case, did testify that, absent the breach, Glendale would have had a greater "appetite" for interest rate risk, Dr. Baxter testified that, absent the breach, Glendale would have maintained less interest rate risk. This raises some questions about whether Dr. Baxter's model adequately reflects what Glendale would have done with the foregone assets absent the breach. In the end, Glendale's model is premised upon the acquisition of low credit risk assets and the ability to accurately manage high interest rate risks. This kind of management, of course, is largely, if not exclusively, related to the ability to forecast interest rate movements. While the court has no doubt that Glendale would have been involved in this type of interest rate risk-taking, it is difficult to believe that its entire investment approach would be predicated on such a policy.

Third, the testimony has shown that Glendale does not leverage as much of its capital as it can, even allowing for the .25 percent cushion that Dr. Baxter believes is appropriate. Moreover, Glendale's projected ratios for fiscal years 1998, 1999 and 2000 are all well over the 5% required core capital ratios. The fact that Glendale is not taking advantage of these opportunities, by acquiring wholesale assets and funding them with

plaintiff faces an enormous burden in setting forth its damage model because the contract, and the resultant breach, affected the entirety of the bank's operations. Both before and after the breach, the goodwill, or lack thereof, affected the decision-making process in all areas. At the same time, the bank is constantly reacting to stimuli—changes in interest rates and interest rate projections, economic growth and downturns, new market opportunities, disintermediation, and technological innovation—that affect its decision-making and planning. The court is satisfied that plaintiff would have benefitted handsomely in the market had the government honored its goodwill promise. The evidence shows that Glendale has had competent management since the breach, with which even defendant's very bright principal expert, Professor Daniel Fischel (now Dean Fischel), agreed. It would have possessed the ability to continue leveraging, while meeting its capital requirements, giving it a comparative advantage in an industry where more than one-third of the borrowing capacity ultimately was eliminated by FIRREA and FDICIA.[4]

In the event that the court did not accept its model for past and future lost profits, plaintiffs valued the cost of the recapitalization in 1993 at $1.207 billion. Plaintiffs arrived at this figure by calculating the total cash outflows to investors in the recapitalization while subtracting the cash inflows from investing the recapitalization proceeds. Plaintiff estimates that the net cost of raising the $451 million of capital in 1993 at $1.207 billion. Defendant disputes this number and argues, to the extent plaintiff is entitled to any damages as a result of the recapitalization, it is entitled to only the flotation costs for the issuance, which defendant puts at $27.98 million.

There is something inherently odd about this alternative cost of capital estimate. In essence, plaintiff is contending that its capital cost over two and a half times the capital raised. But elementary principles of finance suggest that plaintiff received $451 million

some combination of retail and wholesale liabilities, suggests that they either do not exist or are not as profitable as the model would suggest. This is particularly so since, unlike other foregone assets and liabilities of the bank, the strategy in the Baxter model is not nearly as reliant on the retail franchise and core operations of the bank to succeed.

As Professor Fischel explained, it is an elementary principle that one is more inclined to take risks when one is risking less of one's own money. Supervisory goodwill, in effect, permitted Glendale to take more risks, since it could leverage more on less tangible capital. The court believes that Glendale would have taken risks, but that the Baxter model does not really reflect the risks and ultimate rewards. Rather than betting a large portion of the balance sheet on the direction of interest rates, the court believes, given the other testimony about the strength of Glendale's management, its strong retail networks in California, Florida, and Washington, and the state of the economy over the last 10 years, that it would have done very well with its foregone assets, just not in the manner that Dr. Baxter's model predicts.

4. The court finds the testimony of Nobel Laureate Merton Miller, a brilliant scholar, regarding the value of leverage of little utility in this case. Professor Miller testified that any contention that Glendale lost something of value was meritless because leverage, standing alone, has no value. Plaintiffs convincingly point out that, notwithstanding the general principle of finance for which Dr. Miller won the Nobel Prize in Economics in 1990, the situation of thrifts and other lending institutions is different, because they have access to low-cost, government insured borrowings (retail deposits) which are unavailable to other institutions. In addition, the court realizes that other factors, including a thrift's management, the markets it operates in, and its retail branch network, are all relevant to taking advantage of the access to leverage and profiting from it. Banks are ultimately in the business of making money by lending money, and generating a return based on the spread between interest earning assets and interest bearing liabilities.

In support of the government's position that Glendale actually owes the government a debt of gratitude for breaching the contract, it points to statements made by Glendale at the time FIRREA was passed, in which Glendale asserted that it believed the law would benefit Glendale. This, of course, ignores the evidence that Glendale was desperate to protect its rights under the contract, and urged legislators to protect Glendale's rights in any reform legislation that the Congress ultimately considered and passed. But the statement is telling, because it suggests that Glendale realized at the time of FIRREA that it would have the effect of forcing irresponsible operators out of the business by eliminating borrowing capacity. It realized that FIRREA could create what the government considers the relevant economic item—"profitable opportunities"—for thrifts that were well-run and *which were permitted to take advantage of those opportunities*.

and paid $451 million for that money. Although plaintiff shows that it had to pay a premium for this capital, it also had to convince new investors that it had profitable opportunities which would make it likely that their investment would bring a return. Moreover, the evidence showed that the offering was conditioned on raising the entire amount, so investors did not have to pay a risk premium to cover the chance that Glendale would nonetheless be imminently seized. The court does not find this to represent a plausible cost of the capital. The court does not, however, consider this issue definitively, as it was first raised in the rebuttal case as a non-preferred alternative measure of damages.

At the same time, defendant's argument that plaintiff's recovery should be limited to the flotation costs of the offering would be justified only if plaintiff had made no efforts to raise capital prior to 1993. Defendant made several arguments, including a theoretical argument that an entity can always raise capital if it has profitable opportunities, and an event study[5] showing that Glendale's stock price improved in the days after the passage of FIRREA, to support its hypothesis that Glendale, indeed any thrift, could have raised capital after the passage of FIRREA. The credible testimony of persons who actually raise capital, and who were involved in the market at that time, however, severely undercuts this theoretical argument. Plaintiff's investment bankers all testified that the capital markets to thrifts generally, and to Glendale specifically, were closed after the passage of FIRREA, and the evidence offered by Glendale's officers at the time clearly indicated that plaintiff was endeavor-

ing to raise capital to fill its capital hole in the immediate years after the breach. These efforts were extensive and without success. There was no credible evidence that Glendale could have raised additional capital before it actually did in 1993.

The court will review the "wounded bank" portion of plaintiffs' damage claim in its discussion of restitution and reliance damages.

## IV. RELIANCE DAMAGES

Plaintiff seeks, as an alternative, reliance damages in the event that lost profits have not been proved. As stated previously, the reliance interest seeks to put the injured party "in as good a position as he would have been in had the contract not been made." *Restatement (Second) of Contracts* § 344(b). Glendale seeks both pre-breach and post-breach costs associated with the contract that it claims it otherwise would not have had to incur absent the contract. The pre-breach costs consist of the purchase price for Broward (which plaintiff figures as the excess of its liabilities assumed by Glendale), the cost of acquiring related Florida operations, which it otherwise would and could not have done had the contract not been entered, and Glendale's payment of $18.24 million to the government under the contract's interest rate provision. In addition, plaintiff contends that it is entitled to certain post-breach damages it incurred in reliance on the contract, including all post-breach losses from the sale of the Florida franchise in 1994 that were made in reasonable reliance on the contract, as well as post-breach wounded bank damages that resulted from plaintiff's

---

5. The court's view of the value of event studies was informed significantly by what apparently happened to the price of Glendale's stock after the court held a status conference with the parties at the close of plaintiff's case-in-chief. This is something that the court has quite often done in past cases, in an effort to let the parties know how the judge views the case at that point in the trial and also to guide them towards settlement if possible. The court apprised the parties that it believed plaintiff had presented a strong case, but that this opinion obviously was made without the benefit of hearing the government's case, and the court obviously would reserve judgment on the merits until defendant had presented its case. Notwithstanding this limited statement, the mar-

ket adjudged it to be very pro-Glendale, and Glendale's stock price rose considerably immediately afterwards. This phenomenon illustrated to the court, which believes very little could be read from these remarks, how speculative and unreliable event studies were. If the market has this difficult a time evaluating these remarks, it needs more than one week (the time period of Professor Fischel's event study) to digest all the new information inputs created by FIRREA. It certainly calls into question the relevance of the stock price of Glendale immediately after the merger. While long-term market valuation is often a very reliable indicator of value, short-term market effects can be caused by the most frivolous speculation.

failure to remain in capital compliance. When plaintiff nets out the various benefits it gained from the contract, it arrives at total reliance damages of $862,777,000.

Defendant contends that plaintiff is entitled to no reliance damages. As a preliminary matter, although the government agrees that reliance damages are an appropriate alternative if proved, it argues that such damages should not be allowed in this case. Defendant cites *L. Albert & Son v. Armstrong Rubber Co.*, 178 F.2d 182, 191 (2d Cir.1949), for the proposition that the court should not "knowingly put plaintiff in a better position than he would have occupied, had the contract been fully performed." Because, the argument goes, the breach forced Glendale to exit ultimately unprofitable lines of business, it benefitted Glendale, and the court should not reward a party that was not harmed, and indeed benefitted. The court finds the legal principle sound, but irrelevant to the facts. Although the government sufficiently cast doubt on the credibility of plaintiff's damage model for the purpose of proving the amount of expectancy damages, it did not alter the other evidence put on by Glendale that shows a real and large amount of economic harm suffered. The court agrees that the evidence about precisely what Glendale would have done, in the absence of the breach, has not been shown to warrant awarding lost profits, but neither has there been any showing that they Glendale benefitted from the breach. Indeed, defendant's own principal overarching argument against the awarding of lost profits—that it requires a clairvoyance that only the benefit of hindsight and history can give a mortal—argues against its argument that Glendale was better off thanks to the government's breach.

Defendant makes two additional significant arguments against plaintiff's reliance damages. First, defendant argues that the starting point for awarding reliance damages, which plaintiff does by crediting the excess of Broward's liabilities over its assets, is not reliance damages, properly considered. The court tends to agree, and believes that this liability assumption is better understood under a restitutionary theory. This is so because, while the evidence obviously shows that Glendale assumed the entirety of Broward's liabilities and its assets, and was responsible for the difference (to be assisted by the government's goodwill), it did not show that it actually had to expend that amount in reliance on the contract. Rather, it assumed the debts, promised to pay off liabilities as they came due or were demanded, and, it was hoped, return the entire operation to the black.

The government's other argument is that Glendale is not entitled to post-breach reliance damages. The defendant cites only one Bankruptcy Court case, *Sulakshna, Inc. v. Transmedia Network, Inc.*, 207 B.R. 422, 434 (Bankr.E.D.Pa.1997) in support of this proposition. That ignores the real issue, though, which is whether Glendale suffered these damages, either pre- or post-breach, in reasonable reliance on the promise. Hence, post-breach reliance damages, if made in reasonable reliance on the government's contract, are certainly awardable if proven. Thus, there is no legal or economic principle which supports the government's contention. The government states: "reliance on the contract for five years after the breach cannot be reasonable." The court disagrees, given the nature of this contract, which involved a transaction that altered Glendale's balance sheet radically at the time of the merger, affected its operations for eight years before the breach, and then required another massive restructuring of its balance sheet. In this setting, reliance damages can be shown, even many years after the contract. Indeed, plaintiff's claims for post-breach reliance damages are classic reliance. If proved, they are classic reliance damages because they seek to reimburse plaintiff for costs it never would have incurred had the contract never been entered. The fact that the breach was so devastating, and affected the totality of the bank such that these costs were incurred long after breach, if proved, is hardly a reason for finding reliance damages "unreasonable."

The extent of reliance damages to which plaintiff is entitled will be discussed in the section on restitution damages.

## V. RESTITUTION DAMAGES

Restitution is a party's interest in having restored two him any benefit that he has conferred on the breaching party. *Restatement (Second) of Contracts* § 344(c). The leading precedential case in the Circuit, cited by both parties in respect to their positions, is *Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509 (1965). *Acme Process* both affirms the availability of restitutionary relief in breach of contract cases against the government and sets the standard for such an award. "The applicability of restitution as an alternative for breach is well-established in both the federal and state courts." *Id.* at 528. But, the court also stated another standard regarding the limits of restitution in the contract sphere. Its purpose is "to restore the innocent party to its pre-contract *status quo,* and not to prevent the unjust enrichment of the breaching party." *Id.* at 530. The court is thus guided by two principles, that restitution is an appropriate contract damage remedy, but that it is not designed to punish the breaching party.

It is the court's view that restitution provides the clearest and best rule for allocating damages in this case.[6] That is because the complexity, breadth, and length of the contract which was breached make it difficult to award expectancy damages, including Glendale's lost profits, which the court believes would be most consistent with the very purpose of contract law. The difficulty, as plaintiff's model demonstrates, is the bank is operating in a dynamic market, making dynamic decisions, and responding to millions of stimuli in order to run a profitable enterprise. The government's breach fundamentally altered how the bank did these things, which makes it difficult to determine what plaintiff would have done to generate a return on their regulatory and regular capital. The extent of the breach, and the consequent difficulty in ascertaining lost profits, does not, and should not, however, immunize the government from paying appropriate damages.

Restitution provides a remedy, and a fair one. The government received a very significant benefit in 1981, when Glendale merged with Broward. It then failed to honor its promise to Glendale upon which the contract was premised. This created a total and material breach, effectively denying Glendale both all the benefits of the contract and placing it in a far worse position than it was before the contract was entered. Restitution, which is designed to return the parties to the position they would have been in had the contract not been made, would assign any benefits conferred on defendant at the time the contract was formed to plaintiff.

There are three principal components of plaintiff's restitution claim. First, plaintiff claims restitution damages in the amount of $509.921 million, which is the amount by which the liabilities of Broward exceeded its assets, less the total value of all benefits Glendale received from the transaction. Second, plaintiff claims restitution damages for the interest earned on the money in the FSLIC insurance fund that the government was able to invest because it did not have to cover Broward's shortfall. This totals $1.111 billion. Third, plaintiff claims that, in addition to its restitution damages, the law entitles it to any non-overlapping reliance dam-

---

6. The government also argues that restitution is limited by expectancy damages. The government cites the Restatement (Second), which states: "Although [restitution] may be equal to the expectation or reliance interest, it is ordinarily smaller because it includes neither the injured party's lost profit nor that part of his expenditures in reliance that resulted in no benefit to the other party." *Restatement (Second) of Contracts* § 344 cmt. a. Defendant also cites *Kinzley v. United States,* 661 F.2d 187, 228 Ct.Cl. 620 (1981) for the proposition that plaintiff cannot invoke alternative theories of recovery when the measure of damages that would place him in the same position as if the promised performance had been carried out can be established. *Id.* at 193. The court does not disagree that expectancy, which in this case includes lost profits, because it was both foreseeable and the very purpose of the contract, would be preferable, in order to ensure that plaintiff got the benefit of the bargain. But proving such damages in this instance has proved impossible. That does not mean that plaintiff should not be able to prove, and get, a recovery that, as best as possible, attempts to make it whole. To rule otherwise would allow the very severity of the damage suffered by the non-breaching party to benefit the breaching party.

ages which it paid, which it would not have paid had the contract not been entered.

As discussed more fully below, Glendale is entitled to restitution damages for the benefit conferred on defendant when the contract was entered in 1981, in the amount by which Broward's assets exceeded its liabilities on the date of the merger, less the value of the benefits Glendale received from the contract. It also is entitled to non-overlapping reliance damages which it proved that it suffered, but would not have, had the contract never been entered. It is not entitled, however, to any interest earned by the FSLIC on any funds which the FSLIC had at its disposal because it did not have to cover Broward's deficit. Plaintiff and defendant differ fundamentally on the value of these things.

### a. Value of Glendale's assumption of Broward's liabilities

■ Glendale values this benefit at the dollar value of Broward's net liabilities, or $798.291 million which Glendale relieved defendant from the obligation to pay after the contract was formed.[7] Defendant, on the other hand, values the benefit at "zero, or near zero."

Defendant makes several arguments in support of valuing the benefit to the government at zero. First, defendant argues that Glendale was insolvent, or nearly insolvent, at the time of the merger, and therefore had no capacity to confer any benefit on defendant. Second, the problems that had beset the industry, including Glendale and to a larger extent Broward, were based on the sustained historically high interest rates. These hurt thrifts which had to fund their operations with high-cost short-term borrowings while their assets were locked in low-interest, fixed-rate loans. Thus, according to

the government, Glendale could give the government nothing: either interest rates would come down, and Broward's—and Glendale's—problems would be eliminated, or interest rates would stay high, at which point Glendale and Broward would both have to be liquidated. Consequently, Glendale was a vehicle to maintain Broward until, regulators prayed, rates would come down. Third, the government argues, to the extent any benefit was conferred, it was worth far less than the dollar value of Broward's excess liabilities, because the government would never have liquidated Broward and would have picked another, much less costly, weapon from its arsenal to deal with the problem.

The government's challenges to benefits conferred on it by the contract are either wrong, and contradicted by the regulators themselves, or irrelevant to the inquiry. As to the question of Glendale's market, as opposed to book, solvency, the question is irrelevant. The government offered the opinion of Dr. Hamm that Glendale was market insolvent at the time of the merger. The court takes no position on the credibility of this opinion, because it is irrelevant. Regulators were concerned with book value solvency and the ability of the institution going forward to be viable, and to take responsibility for managing—and paying—the liabilities of Broward as they came due. These are both things that Glendale clearly possessed, and were the relevant criteria for the regulators. Similarly, the government's argument that plaintiff could not offer any benefit to the government because both Glendale and Broward suffered from the same endemic problem is irrelevant. Plaintiff had something the government wanted: a healthy thrift that had managed the sustained high interest rates much more successfully than Broward, and which was poised to survive.[8]

---

7. Pursuant to the contract, the supervisory goodwill that plaintiff was entitled to amortize over the course of the contract was $734 million. However, the market value of the excess of Broward's liabilities over its assets on the date the merger was approved was $798.291 million, which includes the market value of the net loss as of September 30, 1991, as calculated in the November 19, 1981, FHLB Board package, as well as an additional $14.484 in losses between September 30, 1981 and November 19, 1981,

which both Drs. Baxter and Horvitz believed should be included.

8. This government argument also presumes that the government was taking a wild gamble, in essence playing a "double or nothing" game with the FSLIC insurance fund and, ultimately, the taxpayer's money. That is because, if the government truly believed its fatalistic argument, it was willing to gamble the health of two thrifts, one far more viable than the other at the time of the merger, in the hopes interest rates would

Third, the government argues that any benefit was far less than the dollar value of the net liabilities Glendale assumed because the government would never have liquidated Broward had there been no contract. The court questions whether this would be relevant, but it does not matter, since defendant provided no evidence that it would not have liquidated. Prior to trial, the court anticipated that defendant might put on evidence showing it had a formal policy for resolving these matters, and that those costs could be ascertained. But what became clear from the testimony at trial was that the government had no policy or policies, and dealt with their mounting inventory of problem institutions at that time on an ad hoc basis. This was an effort to mitigate a growing disaster, with one goal in mind: to dispose of problems or soon-to-be problems and then worry about the next problem. There was no rational, sustained resolution strategy in place, so the government and the court simply cannot know what would have happened had the contract not been entered: However, anecdotal evidence in the testimony suggests that if Broward was not liquidated a more likely government takeover would have significantly expanded the loss to the government beyond the immediate liquidation loss.

The court does know that on the date of the merger Glendale assumed the liabilities of Broward, every dollar of them, and the thrift was responsible for ensuring that Broward's operations, and most relevantly, its obligations as they became due, would be met by Glendale. At that time, the entire operations of Glendale, including its capital, were pledged to that effort, and the govern-

ment was similarly relieved of its obligation for those liabilities.[9] In addition, the testimony adduced, including that of Dr. Croft, Mr. Connell, as well as the government's own witness, the former Director of the FSLIC, Brett Beesley, (who testified, "we would not see this situation back because it would be resolved"), confirms that the parties viewed this as a permanent solution. As Dr. Croft pointed out, and common sense shows, it would be irrational to view it any other way. Dr. Croft was an impressive witness. His statements were clear, factual and not affected in the least by the cross-examination.

Most tellingly, the regulators who engineered the deal *at the time it was made* valued the benefit to the government at three-quarters of a billion dollars, or roughly what Glendale currently says was the immediate benefit to the government. FHLBB Chairman Richard Pratt stated that "the solution which FSLIC found is one which appears to save the people of the United States ... approximately three-quarters of a billion dollars." Moreover, far from considering this deal valueless, as the government now contends it was, FSLIC Chairman Beesley sated at the time that he did not think the government would "ever see a deal like this one in terms of its benefit to the FSLIC." The government's own statements at the time do not support its currently articulated litigation theory that the contract provided no benefit to the government or the people of the United States.

Accordingly, the value of the benefit conferred by Glendale to the government, at the time the contract was made, is $798.291 mil-

come down. There would either be prosperity or a catastrophe. That would simply be irrational, and a desperate roulette wheel gamble. As Dr. Croft testified, the regulators were not interested in simply creating a larger institution with even larger losses which would be back on the regulator's doorstep at a later date. A more realistic view, which is supported by the testimony of government regulators, is that the government believed that the merged entity, with the relative health of Glendale, would make profits, fill its capital hole, thrive, and hence relieve the government of liability.

9. The court understands, of course, that the FSLIC stood behind almost all of these liabilities, both before and after the merger. Just because

this contingent liability existed, however, does not mean that the government did not receive a thing of very real value in consideration. The evidence is unambiguous that the government considered this to be a permanent solution that resolved a potential problem, and it would be irrational to view it otherwise. In addition, the logical implication of the government's argument is that plaintiff could and did provide nothing of value because the government continues to back the deposits. This would suggest that there was no consideration exchanged, which goes to the heart of the liability question, already conclusively resolved in plaintiff's favor. *See United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

lion, which is comprised of the government's contemporaneous calculation of the total loss to FSLIC avoided by the merger through September 30, 1981, as well as additional losses of $14.5 million incurred by Broward between September 30 and November 19, 1981.[10] The government does not dispute these numbers, only their relevance to any damage award, so the court accepts plaintiff's calculation.

Plaintiff also seeks restitution in the amount of $18.24 million that Glendale paid to the government under the interest rate shifting provision of the contract. The government argues that this portion of the contract is discrete and fully performed by both parties so that recovery is unwarranted. Plaintiffs put forward persuasive evidence that this provision was negotiated as part of the overall agreement, and that the terms of the overall contract would have been altered, had the government not agreed to grant a 40–year amortization period. As the affidavit of David Hansen indicates, had Glendale not received the benefit of the 40–year amortization protection it would have demanded other modifications, including greater interest rate protection and other government assistance. It is impossible to treat the provision as autonomous, and plaintiff is entitled to the return of these payments, the amounts of which are not challenged by the government, as restitution of a benefit conferred on the government.

### b. Interest benefit that the government gained

■ Plaintiff argues that it is entitled to the interest that the FSLIC fund earned on the funds that it did not have to use to liquidate Broward, which plaintiff calculates at $1.11 billion. Plaintiff put on credible

evidence that it was understood, and a consideration of regulators, that this merger would enable the insurance fund to preserve, and augment through investing, the amount in the fund. However, it is axiomatic that, as *Acme Process* instructs, restitution damages are recoverable in contract, but not in such a manner as to prevent the unjust enrichment of the non-breaching party at the breaching party's expense. To the extent that the theory of restitution contemplates the disgorgement of benefits without a corresponding loss to the plaintiff to prevent unjust enrichment, it is when a tortfeasor, rather than a contracting party, breaches a duty. The rule is designed to ensure that a wrongdoer does not benefit from his wrongful action.

■ The disgorgement of any interest earned in the fund would have to be under an unjust enrichment theory. Restitution in the contract realm is designed to put the non-breaching party back in the position it would have been had the contract never been made. In this instance, a clear benefit to the government was the assumption of the liabilities, which is properly credited to plaintiff, since prior to the contract plaintiff did not have an additional $798 million in liabilities for which it was responsible. However, the benefits are unequal, because prior to the breach Glendale did not have the money to cover the liabilities; what it had was the ability to assume those liabilities and, going forward, subject to the conditions of the contract, to assume and pay off the liabilities of Broward as necessary. It did not have $798.2 cash to invest at a market rate, which the FSLIC did. There was a disequilibrium of position which enabled the FSLIC to do what Glendale could not do before the contract. To award Glendale those costs would be to award Glendale dollars that it could not pos-

---

**10.** The government cites two recent cases, *Far West Federal Bank, S.B. v. Office of Thrift Supervision–Director*, 119 F.3d 1358, 1367 (9th Cir. 1997) and *RTC v. FSLIC*, 25 F.3d 1493, 1504–05 (10th Cir.1994) in support of the proposition that the court cannot grant an award that exceeds Glendale's initial cash investment. The court notes, first, that in other *Winstar* litigation the government has recommended that the court not follow *Far West* because it is not the law of the Circuit. The court does not believe it has been transformed into that now. Regardless, the cases are factually distinct, and involve the recovery of cash restitution for investors of their initial investments. These investors however, did not pledge the entirety of their existence as a viable enterprise to the government as part of the contract, like Glendale did, and assume individually all the obligations of the institutions in which they were investing, as Glendale did. Aside from the presence of banks and the alphabet-soup banking agencies, the cases are factually very different, and legally irrelevant to the resolution of this restitution claim.

sibly have invested had the contract never been entered. It would disgorge benefits that the government earned as a result of the contract that, although made possible by the contract, could not have been earned by Glendale. Glendale is not entitled to that interest earned on the assets of the insurance fund.

### c. Non-overlapping reliance damages

■ The purpose of contract damages is not to punish a breaching party; rather, it is to do justice for plaintiff and try, as closely as possible, to approximate its damages. Moreover, the rules governing the three interests are not strict and separate. As the *Restatement (Second)* notes: "The interests described in this Section are not inflexible limits on relief and in situations in which a court grants such relief as justice requires, the relief may not correspond precisely to any of these interests." *Restatement (Second) of Contracts* § 344 cmt. a. The court therefore sees the categories of restitution, reliance, and expectancy as not inflexible and completely separate, but designed to enable the court to fashion a remedy that adequately compensates a party for damages it has suffered.

■ On that point, both parties agree that a party may not recover both expectancy and restitution damages, because the party should not be able to get the value of what it conferred to the other party as well as the full value had the party fully performed. One remedy seeks to put the non-breaching party in the position it would have been in had the contract not been made, while the other seeks to put it in a position it would have been in had the contract been performed. On the other hand, plaintiff argues that it should be entitled, in addition to its restitution award, to any other non-overlapping reliance damages. Defendant objects generally to the award of these damages, whether standing alone or as part of any restitution award.

Plaintiff cites several cases in support of the proposition that an aggrieved party is entitled to recover its restitution interest as well as any non-overlapping post-breach costs that plaintiff suffered which it never would have suffered had there been no contract, and no breach of contract. *See, e.g., CBS, Inc. v. Merrick,* 716 F.2d 1292, 1296 (9th Cir.1983). Also, this concept is not inconsistent with the theory of both restitution and reliance, which are designed to put the non-breaching party back in the position it was prior to the contract, because plaintiff should not have to suffer any post-breach costs it would not have had to pay had there been no contract, and hence no breach. Plaintiff, thus, should be entitled to recoup any such damages if proved.

■ The principal amount of non-overlapping reliance damages plaintiff seeks are "wounded bank damages" caused by Glendale's failure to maintain capital compliance after the breach. Glendale showed, first, that it had an historic advantage in cost of funds over its competitors in the 11th District for a ten-year period prior to falling out of capital compliance in 1992; it also provided credible evidence, through its highly qualified and perceptive expert Dr. Paul Horvitz, that Glendale would not have fallen out of compliance but for its entry into this contract and the subsequent breach by the government. Dr. Horvitz possessed the unique blend of a brilliant academic and a practical former regulator with an impressive bibliography dealing with issues relevant to this case. The evidence showed that Glendale lost an historical cost advantage over its competitors because the government's breach ultimately forced Glendale out of capital compliance. Glendale's officers and experts also credibly testified to the effect on depositors when a bank falls out of compliance and is subject to a PCA. It also showed that a typical and logical response is to raise rates to both attract and keep deposits. Accordingly, since plaintiff has proved adequately its wounded bank damages, it is entitled to recover these, as non-overlapping reliance damages, in addition to any restitution recovery. This amount compensates plaintiff, for damages it actually suffered, but which are not protected by its restitution interest. This amount, pursuant to the credible model presented by plaintiff's expert Dr. Baxter, is $335.4 million.

#### d. Other miscellaneous relief

 Plaintiff seeks $11.48 million for increased deposit insurance premiums and $4.675 million in increased OTS assessments which it incurred as a result of the breach. Plaintiff argues that these are either restitution or reliance damages. They are more appropriately styled reliance damages suffered as a result of falling out of capital compliance. The discussion in the section above indicates they would not have been incurred had there been no contract and consequently no breach. Plaintiff is hence entitled to this amount as non-overlapping reliance damages.

Plaintiff also seeks an additional $29.232 million in other increased post-breach costs. These are comprised of the transaction costs from the sale of University Savings ($4.472 million), the transaction costs from the 1993 recapitalization ($24.235 million) and custodial fees paid to the Federal Home Loan Bank ($524,932). Plaintiff has shown that all these costs were suffered as a result of the breach, and would not have been incurred had the bank not fallen out of capital compliance. They are not protected by the restitution interest, but are likewise recoverable as non-overlapping reliance damages.

#### e. Offsets to plaintiff's restitution claim

It is of course the purpose of restitution to put the parties back in the position that they would have been in at the time of contract formation had there been no contract. Concomitant with an award based on the benefit conferred to the breaching party is a credit to the breaching party and an offset to the restitution award by the amount of any advantages the non-breaching party received under the contract. Mr. Brad Plantiko of KPMG Peat Marwick has meticulously, and credibly, documented that the gross recovery by Glendale from Florida under the contract is $288.37 million, which reflects the 1994 premium it received for the sale of Broward, loan accretion, interest rate declines, and loan sale gains.

#### f. Conclusion

Plaintiff is entitled to recover $908.948 million in restitution and non-overlapping reliance damages. This is comprised of the net benefit conferred on plaintiff, $798.291 million, less offsets credited to the government for benefits that plaintiff received as a result of the contract, in the amount of $288.37 million, for a net benefit of $509.921 million. It includes additional restitution damages of $18.24 million paid pursuant to the interest rate provision of the contract, the non-overlapping reliance wounded bank damages of $335.4 million, the non-overlapping reliance damages of $16.155 million for increased insurance premiums and OTS assessments, and the other $29.232 million in post-breach reliance damages which were caused by the breach.

The court contemplated one alternative theory of damages not directly dealt with by either party. Plaintiff has asked for restitution damages based on the amount of the immediate benefit conferred by the institution upon the government at the time of contract formation, and the court has awarded this based upon the reasoning stated above. Glendale also asked for a recoupment or disgorgement of the profits that the FSLIC fund earned after that time from the amount that the fund was saved. Even though the evidence is clear that the government saw these earnings as a very real benefit that the contract brought the government, the court denied this part of the claim, over a billion dollars. The court denied the amount because Glendale would not immediately have been able to earn this money since it did not have the $798 million in cash to use in the non-merger world, that would have occurred had the contract never been entered into.

However, if the government had lived up to its legal obligations and paid restitution on the day of the breach, making Glendale whole on that date, Glendale would have had the use of that capital from the date of breach until the present. Therefore, a realistic economic measure of Glendale's loss in addition to the pre-breach restitution, would be the return of the profits the FSLIC fund has earned from the date of the breach until the time of payment of the judgment. This award would be based on the government's actual gains from the transaction. The theo-

**410**

ry or amount was never put forward at trial, and would be an alternative measure to the non-overlapping reliance damages. Because of the uncertainty of this amount (probably over $500 million since the time of breach was about mid-point between contract formation and today) and the novel legal issues involved, the court has decided that the non-overlapping reliance damages are a surer measure of plaintiff's damages since the breach, although they probably do not compensate plaintiff as symmetrically or as adequately.

## VI. CONCLUSION

Much of space in the post-trial briefs was spent arguing plaintiff's right to argue each of the three remedies, and whether plaintiff could elect the remedy that gave it the most damages. The court need not deal with the issue, because the court believes it has crafted a remedy that attempts, as best as possible, to compensate plaintiff for the actual amount by which it was damaged under traditional restitution theory. The court recognizes that damages, particularly involving a thrift that entered a 40–year contract 18 years ago, which was breached nearly ten years ago, necessarily is not going to be found with the precision that one could determine damages resulting from the breach of a smaller, more discrete contract. But this should not, and cannot, defeat plaintiff's claim for damages. Put simply, the government should not be immunized from paying contract damages because the extent of both the contract and breach, and the time that has elapsed between the breach and today, makes it more difficult to calculate or conceptualize damages. The court has thus endeavored to deal as best as it can with the problems posed by the passage of time and the magnitude and complexity of the contract and the government's breach. The court believes its damage award, as closely as possible, compensates plaintiff for the damages it has suffered.

The court must also raise what is a troubling feature of this case. Plaintiff's contract was breached nearly 10 years ago, and nearly eight years prior to the commencement of trial in this case. Defendant has had the benefit of using money that constitute plaintiff's damages for 10 years. While the court tends to believe that it cannot award plaintiff interest on its damages from the time of breach, it also understands the frustration of plaintiff, who fought for six years on the question of liability against the government, only to have the government tell it, at the end of this laborious process, that Glendale had suffered no damages.

It has cost each side tens of millions of dollars to litigate this case. The court imagines that the total cost at this point well exceeds $100 million. It is the court's profound hope that the 120–some *Winstar* cases still pending on the court's docket will take heed. Each side now has more information on the issues involved. The court strongly believes that settlements, where fair compromise occurs, are in everyone's interest. The court calls upon all parties involved in pending cases to consider what alternatives, short of continuing litigation over the coming years, may resolve these cases fairly. It is hoped that each coordinating committee in the *Winstar* litigation will report on this question at the May meeting.

Plaintiff is entitled to $908,948,000 in restitution and non-overlapping reliance damages.

**IT IS SO ORDERED.**