**GLENDALE FEDERAL BANK, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 90–772C.**

United States Court of Federal Claims.

Aug. 2, 2002.

---

Ronald W. Stevens, Kirkpatrick & Lockhart, Washington, D.C., with whom were Joseph J. Brigati, Kirkpatrick & Lockhart, Washington, D.C., Richard D. Bernstein, Sidley Austin Brown & Wood, Washington, D.C., for plaintiff.

Jeanne E. Davidson, Deputy Director, with whom were Colleen A. Conry, William F. Ryan, Tarek Sawi, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Stuart E. Schiffer, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## *OPINION*

SMITH, Senior Judge:

This case is before the court after remand from the United States Court of Appeals for the Federal Circuit and upon the motion of plaintiff Glendale Federal Bank, FSB, for entry of judgment. In *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1383–84 (Fed.Cir.2001), the Federal Circuit vacated this court's prior award of damages based on restitution and remanded the case to this court for a calculation of plaintiff's total reliance damages, concluding that "reliance damages provide a firmer and more rational basis than the alternative theories argued by the parties." *Id.* at 1383. Upon remand, plaintiff promptly moved for entry of judgment pursuant to Rules 52 and 58 of the Court of Federal Claims in the amount of $862,777,000, which plaintiff contends is the amount of the actual, out-of-pocket losses sustained as a result of Glendale's reliance on the contract. Defendant opposes plaintiff's motion, and contends that Glendale's reliance damages claim is legally barred and that, even if not legally barred, it is legally and factually infirm in its entirety. Defendant contends that plaintiff's reliance damages are zero.

Plaintiff's motion for entry of judgment relied on the record developed during the trial on damages, which culminated in this court's first opinion on damages. *See Glendale Federal Bank, FSB v. United States,* 43 Fed.Cl. 390 (1999). The court held oral argument on plaintiff's motion on June 26, 2001. The briefing on the motion, as well as the argument, were extraordinarily helpful to the court in formulating this opinion, and the court commends the parties on their written and oral presentations. After careful consideration of the parties' arguments, and after careful review of the relevant legal standards, the factual record developed at trial, and the instructions of the Federal Circuit, the court awards plaintiff Glendale Federal Bank $380,787,000, which represents the to-

tal amount of Glendale's "wounded bank" damages, and other incidental reliance damages, which this court concluded in the earlier trial opinion that Glendale suffered as a result of its reliance on the contract. Plaintiff is not entitled to recover on the remainder of its claim, because plaintiff's reliance damage model fails to measure the "actual losses sustained by plaintiff as a result of the Government's breach." *Glendale*, 239 F.3d at 1383. Assuming that plaintiff cannot obtain interest on this amount, this award is unjust in that plaintiff has lost the interest value of this money for a period of many years. Plaintiff will get significantly less than half of the amount that this court feels is the fair amount by which it has been damaged. This is not justice. However, it is not the job of a court to legislate on what the law should say. Rather, the judge must remain true to his oath by following the law.

## BACKGROUND

The factual record in this case, both during the liability and damage portions of the proceedings, has been well-developed. It has also been extensively recounted, in the opinions of this court, the Federal Circuit, and the United States Supreme Court.[1] The following is therefore intended as a summary of the underlying contract and breach, in order to provide a context for understanding the damages claims currently before the court.

Glendale seeks damages resulting from its 1981 supervisory acquisition of a failing Florida thrift, First Federal Savings and Loan Association of Broward County (Broward). Pursuant to its contract with the government, Glendale was permitted to book Broward's net excess liabilities (or negative net worth) as an asset for regulatory capital purposes, and was permitted to amortize this asset, known as supervisory goodwill, over a period of 40 years. Had Glendale not been able to treat the supervisory goodwill as regulatory capital, it would have been immediately insolvent upon consummation of the transaction, with a capital deficit of nearly

$500 million. As this court stated previously: "the supervisory goodwill and the long amortization was designed to fill the capital hole, permit Glendale to maintain its ability to leverage its existing capital, give the thrift the ability to generate income to replace the amortizing goodwill and, ultimately, make the whole enterprise profitable." *Glendale*, 43 Fed.Cl. at 394.

In 1989, in response to the increasingly dire systemic crisis facing the savings and loan industry, Congress passed the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). Pub.L. No. 101–73, 103 Stat. 183. FIRREA, among other things, greatly restricted the use of goodwill and other intangible assets in the calculation of regulatory capital. FIRREA and its implementing regulations breached the goodwill promise. Plaintiff ultimately shrank by approximately 40 percent after the breach, in an effort to improve its capital position. The thrift was ultimately able to raise $451 million in 1993 to return to capital compliance.

At trial, Glendale sought to prove its entitlement to expectancy, restitution and reliance damages. This court concluded that plaintiff's model for expectancy damages in the form of lost profits was implausible, and instead awarded Glendale $908,948,000 in restitution and non-overlapping reliance damages. *Glendale*, 43 Fed.Cl. at 399, 410. The crux of the restitution component was the market value of the liabilities assumed by Glendale at the time of the transaction, which the trial court viewed as the value of the benefit conferred upon the government by Glendale. *Id.* at 406–07. Once the net gains for Glendale from the transaction were deducted, this trial court concluded that the net benefit conferred on the government was $509,921,000. *Id.* at 409. This court also awarded $380,787,000 in non-overlapping, or post-breach, reliance damages. The largest component of this portion of the damage award are "wounded bank damages," which reflect the increase in the cost of funds which

---

1. The case has been the subject of six trial and appellate court decisions. For a more comprehensive discussion of the underlying contract and breach, see, *inter alia, Statesman Savings Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992);

*Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995) (*en banc*); and *United States v. Winstar*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

Glendale suffered as a result of falling out of capital compliance after the breach. *Id.* at 408–09.

On appeal, the Federal Circuit rejected this court's restitutionary award based on the market value of the assumed liabilities of Broward. The Federal Circuit stated that "it is clear that the Government's promise that was breached had substantial value." *Glendale,* 239 F.3d at 1381–82. However, the Federal Circuit stated:

> [T]he action taken by the purchasing S & L in acquiring the failing thrift did not result in the Government, specifically the FSLIC, saving the dollar value of the net obligations of the thrift. For one, it is not at all clear that but for Glendale's purchase of Broward the Government would have been called upon to make up that deficit then and there. Glendale was only one of a number of potential acquirers of Broward. Alternatively, rather than approve a merger, the Government had open to it the option of hiring new and better management to run Broward and make a go of it, just as Glendale itself did.

*Id.* at 1382. Ultimately, the Federal Circuit concluded that the value of the assumed liabilities in this context does not represent an accurate calculation of the benefit received by the government:

> This case, then, presents an illustration of the problem of granting restitution based on an assumption that the non-breaching party is entitled to the supposed gains received by the breaching party, when those gains are both speculative and indeterminate. We do not see how the restitution award granted by the trial court, measured in terms of a liability that never came to pass, and based on a speculative assessment of what might have been, can be upheld; accordingly, we vacate the trial court's damage award on this theory.

*Id.*

The Federal Circuit remanded the case for a calculation of reliance damages. The Federal Circuit stated:

> [W]e conclude that, for purposes of measuring the losses sustained by Glendale as a result of the Government's breach, reliance damages provide a firmer and more ration-

al basis than the alternative theories argued by the parties.... Reliance damages will permit a more finely tuned calculation of the actual losses sustained by plaintiff as a result of the Government's breach.

*Id.* at 1383. In addition, because the case was being remanded to the trial court, the Federal Circuit elected not to review the reliance components of the court's award at that time, electing to "await the final award review when and if it is appealed." *Id.* at 1384.

## ANALYSIS

A parties' reliance interest is "his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made...." Restatement (Second) of Contracts § 344(b). The principle in reliance damages, according to the Federal Circuit, "is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise." *Glendale,* 239 F.3d at 1382. In addition, the Federal Circuit has stated that "[a]s a general proposition, these damages are available for injuries resulting from activities that occurred either before or after the breach." *Id.* at 1383 (citing Calamari & Perillo, The Law of Contracts § 14.9 ("[A] party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract.")).

In its motion for entry of judgment, Glendale asks the court to reinstate the post-breach "wounded bank" portion of its earlier opinion and judgment, including the prior findings of the court. Plaintiff argues also that it is entitled to recover, as reliance damages, all post-acquisition expenses that Glendale reasonably and foreseeably incurred in reliance on the government's promise and which it was unable to recoup further after the government's breach of the contract, despite reasonable mitigation efforts, less all income Glendale realized from the Florida division. According to plaintiff's experts, the net actual out-of-pocket loss suffered by Glendale in its Florida division was

$527,530,000. When coupled with the $380,787,000 wounded bank damages, plaintiff seeks to have reinstated, and less $45,540,000 in losses already counted as wounded bank damages, plaintiff seeks a total reliance damage award of $862,777,000. This reliance award which plaintiff seeks now is identical to the reliance award plaintiff sought to prove at trial.

*Glendale's Out–of–Pocket Loss on the Florida Division*

Glendale argues that it is entitled to recover all its out-of-pocket cash losses that it suffered in operating the Florida division. Glendale contends, first, that its out-of-pocket cash loss was the reasonable and foreseeable result of Glendale's reliance on the contract. According to Glendale:

> The record establishes that Glendale's management of its Florida division from 1981–1994 [when Broward's deposits were sold] was entirely reasonable, and that its specific decisions to sell Broward's long-term, fixed-rate mortgages, diversify its portfolio to reduce the interest-rate mismatch that precipitated Broward's failure, and expand its operations in Florida were not only foreseeable but made with the government's knowledge and active encouragement.

Glendale's Br. for Entry of J. at 10. Therefore, according to Glendale, it is entitled to reliance damages based on alleged losses it suffered as part of its long-term operation of Broward, and which it was unable to recoup because of the breach.

Second, Glendale argues that it has accurately tabulated its net out-of-pocket cash losses from the operation of the Florida franchise. According to Glendale, its experts have established that Glendale sustained an out-of-pocket cash loss of $527,300,000. This amount, according to plaintiff, represents the actual loss suffered by Glendale by "simply adding up *all* of the Florida liabilities Glendale *paid* through 1994 and then deducting from this sum *all* of the income and asset value it realized in Florida through 1994." Glendale's Br. for Entry of J. at 23.

Defendant makes a multi-pronged attack on plaintiff's claim for reliance damages based on its alleged Florida operating losses. First, defendant argues that the entire claim for the Florida operating losses is barred as a matter of law because these losses are not in fact reliance damages. They are neither "essential" reliance damages—that is, expenditures that plaintiff has incurred in partially performing or preparing to perform a breached contract. Nor are they "incidental" reliance damages. Defendant characterizes these as expenditures made in preparation for a collateral transaction with the expectation that the performance of the breaching party will allow recoupment of that expenditure, with that expenditure now rendered worthless by the breach. Further, the government argues that allowing plaintiff to recover the Florida operating losses would render the government the guarantor against plaintiff's losses, and nowhere in the actual goodwill contract does the government provide such a guarantee. Defendant then argues that, even were the Florida operating losses to be considered reliance costs, Glendale cannot recover them because it cannot show that it would have recouped the alleged losses absent the breach. Regardless, according to defendant, the breach did not require plaintiff to sell Florida, so the breach did not prevent the recoupment because it did not force the sale of Florida, and even if it did force the sale, Glendale received fair value for the franchise as part of the sale.

Defendant also takes plaintiff to task on the calculation of plaintiff's alleged out-of-pocket losses. First, and principally, defendant argues that the basis of plaintiff's calculation of its losses is barred as a matter of law. That is because, contrary to plaintiff's contention, the calculation is really premised on treating the value of the net assumed liabilities as the cost, or initial investment, which Glendale paid for the Florida franchise. Defendant poses the following syllogism to explain its argument: "(1) The Federal Circuit held that Glendale did not pay Broward's excess liabilities. (2) Glendale's claim for [Florida operating losses] turns upon the assumption that Glendale did pay Broward's excess liabilities. (3) This Court must reject Glendale's claim for [Florida op-

erating losses]." Br. of the United States Re. Glendale's Failure to Prove Reliance Damages at 45. In addition, defendant makes several methodological attacks on the composition of Glendale's alleged profits and losses from the operation of Florida.

Although the parties spend considerable time in the briefs arguing over whether Glendale's alleged Florida operating losses are reliance damages under the Federal Circuit's articulation of the scope of the reliance interest, in the end it is does not matter, because plaintiff has failed to persuade the court that its reliance damage model shows any "actual losses sustained by plaintiff as a result of the Government's breach." *Glendale*, 239 F.3d at 1383. Because plaintiff's model does not show any "actual losses," the court need not answer whether the government is responsible for any losses.

The bottom line is that plaintiff's model for calculation of Florida losses relies on treating the assumption of Broward's liabilities as a cost, or initial investment. The report provided by Brad S. Plantiko, plaintiff's accounting expert, makes this unambiguously clear:

> To determine the Pre–Tax Net Recovery to Glendale of its Florida operation, Peat Marwick determined the amount of Glendale's investment in Florida. The amount of Glendale's investment in Florida *is equal to the fair value of the liabilities assumed by Glendale minus the fair value of the assets acquired by Glendale, i.e., the goodwill that Glendale obtained on its books as a result of its acquisition of Broward and other Florida acquisitions.*

(Emphasis added). The Federal Circuit, however, has concluded, based on the facts of the case, that *"neither Glendale nor the Government was called upon to pay the potential losses the fear of which was the motivation for the scenario in the first place." Glendale,* 239 F.3d at 1382 (emphasis added). And, as this court stated in its prior opinion on damages, a critical failing of plaintiff's model is that "it does not show that [Glendale] actually had to expend this amount in reliance on the contract." *Glendale,* 43 Fed.Cl. at 403.

Plaintiff's attempts to get around this holding and the Federal Circuit's focus on "actual losses" are simply unavailing. Glendale con-

tends that it is unnecessary to determine whether the assumption of liabilities constituted a real cost at the time of the merger, because over time Glendale paid cash on its liabilities. Further, plaintiff points to a footnote to Mr. Plantiko's report, which plaintiff argues makes the point that Mr. Plantiko's calculation of Glendale's Florida loss "would be unchanged" if the goodwill was not treated as a cost or investment, provided that it was also not given value as an asset. But, as defendant points out, this footnote does not render the goodwill amount irrelevant to the calculations, but merely states that the results of the analysis would be unchanged whether he treated Broward's goodwill as an actual cost incurred on the day of the merger or an actual cost incurred over the amortization period. It does nothing to alter the reality that Mr. Plantiko's analysis is premised on treating the initial supervisory goodwill figure—that is, the mark-to-market value of Broward's excess liabilities—as Glendale's principle cost or investment.

The central point is that Mr. Plantiko's report does not offer an accurate accounting of the actual losses Glendale sustained in operating the Florida franchise. Stated differently, it does not serve as an accurate measure of the total amount of cash spent in Florida, less the total amount of cash received in operating Florida. Rather, it measures the market value of the assumed liabilities as a cost, but does not answer the question of whether Glendale was called upon to pay a net cash outlay in the amount of the assumed excess liabilities. The court is cognizant of the cases cited by plaintiff that hold that a contractually-binding assumption of a debt not yet due is a cost for purposes of contract damages. But the court is also aware that the framework for the calculation of reliance damages as articulated by the Federal Circuit focuses on actual out-of-pocket losses, not paper calculations of losses, and that much of Broward's paper deficit was eliminated by the reduction in interest rates. If this were a dispute between two private parties the plaintiff's argument would have greater force. But the law of the case on this point is clear:

plaintiff's assumption of Broward's deficit was not a cost.

As plaintiff points out, it paid all liabilities as they came due, in cash. The problem is that plaintiff's model does not measure that figure, in cash. It is predicated on a liability figure that the Federal Circuit has found "never came to pass" and is speculative. Because of these infirmities, and because it cannot serve as the basis for an accurate accounting of plaintiff's Florida losses, the court is compelled to deny plaintiff's motion for damages caused by the Florida operating losses in their entirety.

*Glendale's Wounded Bank and Other Post–Breach Reliance Damages*

In its motion, Glendale does not reargue its case for these damages, but merely requests that the court reinstate its award and findings in support thereof. Defendant devoted considerable time in its response to attacking the case for wounded bank damages, and plaintiff was obliged to respond in its reply brief, although it maintained that the court need not address the issue and should reinstate the prior award.

Although the court is mindful that the Federal Circuit has not addressed the merits of this portion of the court's damage award, the court also believes that there is nothing in the Federal Circuit's decision which requires that the court re-visit its prior findings and award on the wounded bank and other post-breach reliance damages. Additionally, the court believes that these damages meet the criteria that the Federal Circuit has laid out: they are actual, ascertainable damages suffered by plaintiff as a result of the breach. The court therefore reinstates its prior reliance award of $380,787,000.

## CONCLUSION

For the reasons stated above, the court grants plaintiff's motion for entry of judgment in part to reinstate the court's prior award of reliance damages in the amount of $380,787,000. The court denies the motion for entry of judgment with respect to that portion of reliance damages resulting from the alleged Florida operating losses. The

Clerk is therefore directed to enter judgment for plaintiff in the amount of $380,787,000.

**IT IS SO ORDERED.**