**BANK OF AMERICA, FSB, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 95–660C, 95–797C, 95–7971C.**

United States Court of Federal Claims.

March 21, 2006.

Steven S. Rosenthal, Kaye Scholer LLP, Washington, DC, attorney of record for plaintiff Bank of America, FSB. Alan K. Palmer, Douglas A. Tucker, and Maria Whitehorn Votsch, Kaye Scholer LLP, of counsel.

F. Jefferson Hughes, with whom were Deputy Assistant Attorney General Stuart E. Schiffer, Director David M. Cohen, and Deputy Director Jeanne E. Davidson, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. David A. Levitt, Commercial Litigation Branch, Civil Division, Department of Justice, of counsel.

### OPINION

WIESE, Judge.

In a July 21, 2005, opinion, this court directed the parties to calculate the damages associated with the payment of dividends on retained earnings and common stock so that a final assessment of damages could be reached and a final judgement entered in plaintiff's favor. *Bank of America, FSB v. United States,* 67 Fed.Cl. 577 (2005). Pursu-

ant to that instruction, the parties filed their initial briefs on September 9, 2005. In addition, by motion dated August 26, 2005, plaintiff requested the court to reconsider its July 21, 2005, decision denying plaintiff a tax gross-up on its damages award.

The court heard oral argument on these issues on October 19, 2005. In response to questioning by the court, the parties filed supplemental briefs in December 2005 addressing the character of payments made by HFH Partners to the Bishop Estate upon the liquidation of real estate holdings previously held by HonFed. For the reasons set forth below, we conclude that plaintiff is entitled to damages in the amount of $16,750,553 and may apply for Rule 60(b) relief in the event that award is ultimately subject to tax.

### I.

In our July 21, 2005, opinion, the court identified damages in the amount of $12,122,000, consisting of $6,572,000 in net costs associated with the payment of preferred dividends, $4,977,000 in transaction costs, and $573,000 in allowable wounded bank damages. *Id.* at 597. The court also specified that additional damages were owed in connection with HonFed's retention of earnings and HFH's issuance of common shares, but recognized that further calculations would be required to determine the amount of those damages. In its supplemental briefing, plaintiff calculates that additional amount as $5,457,553, representing $829,000 in damages associated with retained earnings and $4,628,553 associated with common stock, for a total damages award of $17,579,553. Defendant urges us instead to offset our original damages calculation by a $4,676,000 net benefit it alleges plaintiff has received, for a total judgment of $7,446,000. We discuss the correctness of these calculations below.

### A.

In our earlier opinion, we endorsed the view put forth by various experts in this case that the cost of raising capital could be measured by the dividends paid in connection with a capital investment. *Id.* at 588–89.

We further noted that the retention of earnings engendered similar costs because it essentially amounted to the raising of new capital from existing shareholders. *Id.* We thus instructed the parties to calculate the cost of retained earnings by reference to the dividends paid. *Id.* at 597.

Pursuant to that direction, the parties begin their calculations with the pro rata dividends attributable to the retained earnings, an amount they identify as $842,000.[1] The government goes on to offset that number, however, by the $6,650,000 benefit it claims HonFed received as a result of retaining earnings. Plaintiff, by contrast, argues that the relevant offset is not the benefit associated with the entire amount of retained earnings, but is instead the benefit associated with only that portion of retained earnings paid out as dividends. Plaintiff identifies that offsetting benefit as $13,000.

Plaintiff's approach, though novel, finds no support in the law. Although HonFed incurred relatively low costs in connection with its retained earnings (because of the short time frame in which dividends were paid out),[2] the thrift nonetheless realized the benefits of those retained earnings in their entirety. Plaintiff's calculation thus ignores the benefits HonFed actually received and in so doing drastically understates the appropriate offset. We are aware of no authority that would permit us to award costs associated with a capital infusion while accounting for only a fraction of its corresponding benefits.

*See, e.g., LaSalle Talman Bank, FSB v. United States,* 317 F.3d 1363, 1375 (Fed.Cir. 2003) (requiring that "the benefits of ... capital must be credited, as mitigation due to the replacement of goodwill with cash"); *American Fed. Bank, FSB v. United States,* 68 Fed.Cl. 346, 357 (2005) (recognizing that the cost of replacement capital should be measured by the dividends actually paid, offset by the benefits from the newly paid-in capital); *Long Island Sav. Bank, FSB v. United States,* 67 Fed.Cl. 616, 638 (2005) (observing that "any favorable consequences [of the breach] must be credited against damages"). *See generally* Restatement (Second) of Contracts § 347 cmt. e (1981) (specifying that an injured party's damages are to be reduced if a smaller loss results from "an especially favorable substitute transaction").

Similarly, however, we are unwilling to credit the government with the full measure of benefits associated with the retained earnings because HonFed would have received those returns even in the absence of the breach. In other words, the $5,808,000 defendant identifies as the net benefit cannot properly be used to reduce plaintiff's total damages award because those benefits did not result from the government's action. *LaSalle,* 317 F.3d at 1371–72 (observing that "when there is a direct relation, in time and in subject matter, between the breach and mitigating events, the damages are reduced accordingly," but recognizing that offset is appropriate only when the benefit conferred

---

1. The record reveals that HonFed retained $82,777,000 in earnings between December 31, 1989, and June 30, 1992, a percentage of which was used in each quarter to make up for the capital shortfall occasioned by FIRREA. (The $50 million Bishop Estate infusion was not alone sufficient to return HonFed to capital compliance.) In order to calculate the pro rata dividends—and thus the cost—associated with the FIRREA-inspired retained earnings, the parties multiplied that quarterly percentage by the total of HonFed common dividends paid in each quarter for a total of $842,000. The parties then calculated the benefit associated with the retained earnings by multiplying the earnings retained in each quarter by HonFed's average cost of funds to reflect the savings generated by employing this lower cost source of capital. Finally, the parties applied their respective offsets (described above) to identify the net costs to HonFed of retaining earnings.

2. In our earlier decision, we refused to award the theoretical costs associated with the retention of earnings and limited damages to those costs actually realized (*i.e.*, paid out) in the form of dividends. *Id.* at 589–90 (citing *Westfed Holdings, Inc. v. United States,* 407 F.3d 1352, 1371 (Fed.Cir.2005) (holding that obligations incurred, but not paid, on subordinated debt and preferred shares issued to finance plaintiff's acquisition of a defunct thrift do not constitute "amounts actually expended" and therefore do not qualify as a reimbursable component of reliance damages); *Fifth Third Bank of Western Ohio v. United States,* 402 F.3d 1221, 1237 (Fed.Cir.2005) (noting that cover damages are not available when "based entirely on hypothetical costs that were never actually incurred")).

is one that the plaintiff "would not otherwise have reaped").

In reaching this conclusion, we find ourselves in the unusual position of having variously stated that the costs of retained earnings are attributable to FIRREA but that their benefits are not. Such a seemingly inconsistent result follows from our earlier finding that while HonFed would have voluntarily retained earnings even in the absence of the breach, the fact that it was forced to do so as a result of FIRREA represented an injury to the bank.[3] As we explained in our July 21, 2005, opinion, "FIRREA transformed a discretionary business decision undertaken to grow the thrift into a mandatory measure required to save it. Significantly, HonFed would have been able, absent the breach, to use both its regulatory capital and its retained earnings, giving it two sources of valuable leverage." *Bank of America,* 67 Fed.Cl. at 586.

That acknowledgment of harm, however, is not the same as finding a quantifiable, compensable injury. Measuring the damages associated with the loss of leverage inherent in the use of retained earnings to satisfy tangible capital requirements would require a lost profits model—an approach the Federal Circuit generally has not looked upon favorably and one plaintiff has elected not to pursue. *See, e.g., Glendale Fed. Bank, FSB v. United States,* 378 F.3d 1308, 1313 (Fed. Cir.2004), *cert. denied,* 544 U.S. 904, 125 S.Ct. 1590, 161 L.Ed.2d 277 (2005) (observing that "experience suggests that it is largely a waste of time and effort to attempt to prove [lost profits] damages"). To the extent that plaintiff has relied instead upon a cost of replacement model for proof of its expectancy damages, we are unwilling to conclude that plaintiff's net cost of retaining earnings increased as a result of the breach.

### B.

■ With respect to calculating the damages related to common stock, we are faced with essentially two areas of dispute. The parties agree that the net cost of common stock can be measured by offsetting the amount of dividends HonFed/HFH paid to the Bishop Estate by HonFed's average cost of funds, a number they calculate as $1,132,000. The parties dispute the significance, however, of a subsequent transaction that occurred in connection with the sale of HonFed/HFH to plaintiff: the creation of HFH Partners and its eventual distribution of real estate proceeds to HFH's former shareholders. In plaintiff's view, Hon-Fed/HFH incurred an additional $3,496,553 in compensable costs when it transferred real estate to HFH Partners, a partnership in which the Bishop Estate held a 22.649 percent ownership stake. Defendant argues, however, that any distributions to the Bishop Estate—whether directly through the funding of a partnership interest by a transfer of real estate or indirectly through the subsequent payout of proceeds realized from the sale of such real estate—would have occurred even in the no-breach world, preventing plaintiff from proving causation with respect to the distributions. Even if such sums were recoverable, defendant further maintains, the $3 million used by HFH Partners for operating expenses should not be counted among those costs. Under this alternative argument, defendant asserts that plaintiff's claim is overstated by $679,470.

### HFH Partners

According to the trial testimony of plaintiff's expert, Dr. Nevins D. Baxter, HFH Partners was established to take ownership of and to liquidate various pieces of real estate that were excluded from the Bank of America transaction (*i.e.,* assets Bank of America was not interested in acquiring). Pursuant to that arrangement, HonFed/HFH transferred ownership of seven properties then appraised at $12,438,000, as well as a $3

---

**3.** Defendant argued in the earlier proceedings that the costs of retaining earnings were themselves unrecoverable because plaintiff would have retained earnings even in the absence of the breach, thus making it impossible to demonstrate that the costs claimed resulted from the government's action. We concluded that plaintiff had satisfied its burden of proving causation, however, since the difference between voluntarily retaining earnings as a business strategy to expand the bank and being forced to retain earnings simply to "run in place" constituted damage to the bank. *Bank of America,* 67 Fed.Cl. at 587.

million cash contribution for operating expenses to the newly formed HFH Partners. Ownership interests in HFH Partners were then distributed to the owners of the HFH common stock, *e.g.*, the Simon Group and the Bishop Estate, in proportions essentially equal to their interests in HFH. Over the subsequent six-year period, from 1992–1998, HFH Partners sold off all of the properties in its possession, ultimately distributing $5,089,000 in proceeds to the Bishop Estate.

In its initial damages calculation, plaintiff identified the $5,089,000 in distributions made by HFH Partners to the Bishop Estate as a recoverable cost to HonFed/HFH. Defendant objected to that characterization on several grounds, including the fact that the payments were made by a non-contracting party (HFH Partners) and occurred after HonFed and HFH had ceased to exist. At the court's prompting, plaintiff subsequently recharacterized its damages, focusing not on HFH Partners' post–1992 distribution of real estate proceeds, but rather on HFH's July 31, 1992, transfer of real estate to the newly formed HFH Partners as a "dividend" paid by HFH to its shareholders. Plaintiff thus recalculated its damages as $3,496,553, representing the value of the interest in HFH Partners at the time it was received by the Bishop Estate based on the estimated value of the assets then owned by HFH Partners.

After extended debate about whether the interest in HFH Partners constituted either a return *of* capital (*i.e.*, the repayment of the Bishop Estate's original investment and therefore not a compensable cost), or a return *on* capital (*i.e.*, a capital gain), defendant finally accepted plaintiff's assertion that the distribution of the partnership interest to the Bishop Estate was a dividend in kind, paid out of the retained earnings of Hon-Fed/HFH.[4] Defendant continues to challenge the recoverability of that sum, however, arguing that plaintiff has admitted that

the non-performing and foreclosed real estate properties would have been transferred to HFH Partners even in the absence of the breach, thus preventing plaintiff from demonstrating causation.

Defendant's causation argument is virtually identical to the case it made in *LaSalle Talman Bank, FSB v. United States*, 64 Fed.Cl. 90 (2005), in which the government insisted that a dividend was not compensable unless it was individually shown to have resulted directly from FIRREA (*i.e.*, that a particular dividend would not have been paid out but for the breach). The *LaSalle* court rejected that reasoning, however, concluding that the breach "need not prompt a particular decision to declare dividends" even where "immediate business considerations [may have] spurred the decision to issue the . . . dividend." *Id.* at 111. Rather, the court explained, it was "sufficient that the breach caused the transfer of some portion of earnings, via dividends, . . . because of the . . . infusion." *Id.*

Similarly, in *Long Island Savings*, 67 Fed. Cl. at 639, the government argued that certain damages were unrecoverable because various actions taken by the bank (*e.g.*, the sale of branches and deposits and the bank's conversion and initial public offering) were "not caused by the breach, but, rather, were the product of an independent business decision." There, too, the court rejected the government's argument, characterizing it as a challenge to the reasonableness of the plaintiff's mitigation efforts in an effort to shift defendant's burden (of proving that mitigation efforts were unreasonable) to plaintiff (who bears the obligation of proving causation). The court ultimately concluded that "[t]here is nothing remote or consequential about these damages. Plaintiffs have isolated costs related only to the capital raised to replace supervisory goodwill. That [plaintiff]

---

**4.** In its December 20, 2005, supplemental brief, defendant conceded that it had no "material dispute" with plaintiff's characterization of the distribution of properties to HFH Partners as a dividend that had an economic cost to HonFed and HFH. That characterization is consistent with the court's finding in *LaSalle Talman Bank, FSB v. United States*, 64 Fed.Cl. 90, 110–11 (2005), regarding a "special dividend" paid from

capital in excess of well-capitalized minimums: "When determining whether a dividend is a return on capital or a return of capital, the relevant criteria is the source of the funds, not the name given to the dividend. So long as the money paid is not a return of capital, it has to be attributed, at least in part, to the parent's capital investment."

had other reasons to raise capital is immaterial." *Id.* at 642 n. 21 (quoting *Home Sav. of America, FSB v. United States,* 57 Fed.Cl. 694, 727 (2003)).

The same reasoning, we believe, applies in the instant case. Our conclusion that the Bishop Estate infusion resulted directly from the passage of FIRREA means that the entirety of the costs associated with that transaction (here defined as dividends paid) are chargeable to the breach. That is the case even if other business considerations later informed the bank's decisions: no business judgement is exercised in a vacuum (including the decision to declare preferred and common dividends). It is thus irrelevant that HonFed/HFH may have had independent business reasons for transferring the non-performing real estate to HFH Partners; the ownership stake in HFH Partners paid as a dividend to the Bishop Estate represents a compensable cost to HonFed/HFH.

*The $3 Million Cash Contribution to HFH Partners*

Having established that the HFH Partners distribution constituted a dividend to the Bishop Estate and thus a cost to plaintiff, we turn then to the calculation of that cost. In defendant's view, the $3 million cash contribution made by HonFed/HFH to HFH Partners to cover management costs should not have been included in plaintiff's damages calculation because no portion of that money was ever distributed to the Bishop Estate. That amount is additionally unrecoverable, defendant argues, because it was used to manage and enhance the market value of the real estate and is thus incompatible with the court's conclusion that plaintiff is not entitled to recover any increase in the value of the properties subsequent to the time of their initial transfer to the partnership. Defendant thus contends that plaintiff's claim should be reduced by $679,470 (the Bishop Estate's proportional share of the $3 million).

Defendant's argument, however, misapprehends the nature of plaintiff's damages claim. The $3,496,553 plaintiff seeks is not the amount actually distributed to the Bishop Estate from 1992–1998 (the approach plain-

tiff in fact initially pursued), but is instead the value of the partnership interest conferred on the Bishop Estate at the time of the transfer. Because the Bishop Estate was given a 22.649 percent stake in a partnership whose assets (including cash holdings) were valued at $15 million, the Bishop Estate received from HonFed/HFH a distribution worth $3,496,553.

The fact that the amount of money later disbursed does not match the original assessed value is immaterial; the relevant time period for measuring damages is when HonFed/HFH made its distribution to the Bishop Estate on July 31, 1992. Indeed, it was that possible change in the value of the real estate, whether an increase or a decrease, that prompted this court to conclude that HonFed/HFH's costs were fixed as of the date the dividend was distributed.

Nor are we persuaded by defendant's argument that the $3 million would not have been necessary had the properties been sold for market value on the date of their transfer. Had HonFed/HFH disposed of the properties on or before July 31, 1992, the $3 million would have been available to be distributed as a dividend or would have enhanced the bank's purchase price, a value that would have been proportionately available to the shareholders. We thus see no reason to deduct the $3 million in operational funds—or more precisely the Bishop Estate's fractional share of that amount—from plaintiff's damages calculation.

## II.

In our July 21, 2005, opinion, we declined to apply a tax gross-up to plaintiff's damages award and chose instead to leave the question of taxability to a later trier of fact who would have the benefit not only of full briefing on the issue, but also of sums certain with regard to the amount of tax in question. Plaintiff now seeks an amendment to that decision specifying that it may file a motion under RCFC 60(b) for relief from the judgment in the event the non-wounded bank damages awarded to plaintiff are found to be taxable.[5] Such a declaration is necessary, in

---

5. RCFC 60(b) provides in relevant part:

On motion and upon such terms as are just,

plaintiff's view, because plaintiff will not be able to challenge the taxability of the award since it has repeatedly conceded that issue both to this court and to the Internal Revenue Service ("IRS"),[6] and indeed has no plans to do so because it acknowledges that the tax is in fact owed. Plaintiff thus fears that in the absence of Rule 60(b) relief, it will be the victim of a tax "whipsaw," *i.e.*, that it will be taxed on an award restoring funds that would not have been taxed in the no-breach world, and thus will fall far short of being made whole.[7]

In support of its motion for reconsideration, plaintiff refers us to several cases in which courts have indeed made explicit reference to Rule 60(b) as a remedy available to both Winstar plaintiffs and the government with respect to the tax gross-up issue. *See, e.g., Long Island Savings,* 67 Fed.Cl. at 656 (explicitly acknowledging the government's right to seek relief under Rule 60(b) if the court's determination as to the judgment's taxability is found to be erroneous); *First Heights Bank, FSB v. United States,* 57 Fed. Cl. 162, 175 n. 20 (2003) (recognizing plaintiff's ability to invoke Rule 60(b) in the event the court's assumption that the award will be exempt from tax is incorrect); *Centex Corp. v. United States,* 55 Fed.Cl. 381, 389 n. 11 (2003), *aff'd,* 395 F.3d 1283 (2005) (noting that RCFC 60(b) would remain available to plaintiffs in the event the court's assumption that the award will not be subject to tax is incorrect). Plaintiff urges us to take the same approach here to protect its right to seek relief under Rule 60(b).

Defendant opposes plaintiff's request, arguing that the subsequent taxability of the award is not a ground for reopening a final judgment under Rule 60(b) (relying on *Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), for the proposition that relief from a judgment is considered an extraordinary measure and is only granted in exceptional circumstances). *See also* 11 Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 2864, at 357–59, 371–75 (2d ed.1995). Defendant additionally argues that any relief available to plaintiff must come in the form of an independent action before either this court or the tax court. That is the case, defendant contends, because the issue of whether plaintiff has been made whole on its contract claim is separate and distinct from the issue of the award's taxability. Finally, defendant maintains that the declaration plaintiff now seeks amounts to an advisory opinion, something the court has no power to render in this case.

Contrary to defendant's assertions, however, we can find no authority that would preclude us from reopening the judgment in the event plaintiff's damages award is ultimately found to be taxable. In *Klapprott v. United States,* 335 U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 266 (1949), the Supreme Court, referring to the final clause in Rule 60(b), held that "[i]n simple English, the language of the 'other reason' clause, for all the reasons except the five particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." While later courts spoke in terms of "extraordinary circumstances" as a prerequisite for the ap-

---

the court may relieve a party or the party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under RCFC 59(b); (3) fraud (whether theretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6)

any other reason justifying relief from the operation of the judgment.

**6.** In an April 16, 2004, letter from plaintiff's outside tax counsel to the IRS, plaintiff acknowledged that its non-wounded bank damages "will be taxable in full" and "will be taxable as capital gain." Plaintiff's tax counsel reiterated that conclusion in an August 17, 2005, letter to the IRS, identifying the non-wounded bank damages awarded by this court as taxable.

**7.** In the earlier proceedings, plaintiff sought a tax gross-up of 37.28 percent, or $24.693 million on its total damages model.

plication of Rule 60(b)(6),[8] other courts have allowed for the application of the rule where the failure to grant relief would work an injustice. In *Pierce Oil Corp. v. United States,* 9 F.R.D. 619 (E.D.Va.1949), for instance, the court reopened a judgment that had deliberately omitted the award of profits taxes that were the subject of an independent action when the independent action was vacated on appeal. The plaintiffs, arguing that, through no fault of their own, they had been deprived of the recovery of tax to which the court believed they were entitled, sought relief under Rule 60(b)(6). The court granted the motion, acknowledging that the omission of the award was "advised and purposed," and observing that plaintiffs had "certainly presented 'a reason justifying relief from the operation of the judgment.'" *Id.* at 621. The court thus reopened the judgement since "[t]o deny the present motion would result in injustice." *Id. Accord, Martin v. H.M.B. Constr. Co.,* 279 F.2d 495 (5th Cir.1960) (upholding the district court's reopening of a judgment under Rule 60(b)(6) to withhold certain taxes from an award in plaintiff's favor).

The Federal Circuit has deemed a tax gross-up appropriate in circumstances where "a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Sav. of America, FSB v. United States,* 399 F.3d 1341, 1356 (Fed.Cir.2005). To the extent that HonFed paid dividends out of post-tax dollars, it would not be unreasonable to conclude that the taxation of its award would unfairly tax the same sum

twice. Plaintiff may thus apply for Rule 60(b) relief in the event its damages award is ultimately subject to tax.

## CONCLUSION

For the reasons set forth above and consistent with this court's decision of July 21, 2005, the Clerk is directed to enter judgment in favor of plaintiff Bank of America in the amount of $16,750,553. In addition, plaintiff's August 26, 2005, motion for reconsideration and amendment is GRANTED, and the Clerk shall dismiss all remaining claims in these consolidated cases. No costs.

---

8. Seminal among these cases is *Ackermann v. United States,* 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950), in which the Supreme Court distinguished the result in *Klapprott* (vacating a default judgement stripping the petitioner of citizenship) as following from "extraordinary circumstances" (at the time of the judgment, the petitioner was serving a prison term, was facing health and financial hardships, and was not represented by counsel). In the absence of such exceptional circumstances, the *Ackermann* Court made clear that "free, calculated, [and] deliberate" choices (*e.g.,* the decision not to appeal) are not to be relieved under Rule 60(b). *Id.* at 211–12. *Accord, Twelve John Does v. District of Columbia,* 841 F.2d 1133 (D.C.Cir.1988). More recently, the Ninth Circuit ruled:

The Rule 60(b)(6) catchall provision "has been used sparingly as an equitable remedy to pre-

vent manifest injustice" and "is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." Thus, a party seeking to reopen a case under Rule 60(b)(6) "must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with the prosecution or defense of the action in a proper fashion."

*United States v. Washington,* 394 F.3d 1152, 1157 (9th Cir.2005), *cert. denied,* — U.S. —, 126 S.Ct. 1025, 163 L.Ed.2d 854 (2006) (citations omitted). In general, these cases are concerned with the actions (or more precisely the inaction) of the party seeking relief, a circumstance not involved here where the court, rather than plaintiff, insisted that the tax gross-up issue be deferred.